PATIENCE DRAKE ROGGENSACK, C.J.
¶ 1. We review an unpublished decision of the court of appeals,[1] affirming in part and reversing in part the summary judgment granted by Dodge County Circuit Court relative to injuries Dennis D. Dufour (Dufour) *318 suffered in an accident for which Dufour was not at fault.[2]
¶ 2. Dufour, the insured of Dairyland Insurance Company (Dairyland), sustained bodily injury and property damage while operating his motorcycle. The tortfeasor's insurer paid Dufour its bodily injury policy limit of $100,000, and Dairyland paid Dufour $100,000 as its underinsured bodily injury policy limit. The parties agree that Dufour's bodily injury damages were in excess of $200,000. Under another provision of Dairyland's policy, it also paid Dufour $15,589.86 for 100% of the property damage to his motorcycle. After paying Dufour all proceeds to which he was entitled under the Dairyland policy, and after Dufour had settled with the tortfeasor's insurer, Dairyland sought and obtained subrogation from the tortfeasor's insurer for the property damages that it previously paid to Dufour. Dufour demanded Dairyland pay him the funds it obtained on its subrogation claim, and Dairy-land refused. Dufour then sued Dairyland for breach of contract and bad faith.
¶ 3. The central issue before us is whether Dairy-land is entitled to retain funds it obtained from the tortfeasor's insurer for property damages Dairyland paid Dufour because Dufour's bodily injury damages exceed both policies' limits for bodily injury. More specifically, we must determine whether the made whole doctrine applies to preclude Dairyland from retaining its subrogation award in this instance. We also consider whether Dairyland acted in bad faith by refusing to turn over to Dufour the funds it obtained as a result of its subrogation claim.
*319 ¶ 4. We conclude that the made whole doctrine does not apply to preclude Dairyland from retaining the funds it received from its subrogation claim because the equities favor Dairyland: (1) Dairyland fully paid Dufour all he bargained for under his Dairyland policy, which included the policy's limits for bodily injury and 100% of Dufour's property damage; (2) Dufour had priority in settling with the tortfeasor's insurer; and (3) if Dairyland had not proceeded on its subrogation claim, Dufour would have had no access to additional funds from the tortfeasor's insurer. We further conclude that Dairyland did not act in bad faith with respect to Dufour's demand for the funds Dairyland obtained as subrogation for the property damages it paid Dufour. Accordingly, we reverse the court of appeals decision in all respects.
I. BACKGROUND
¶ 5. On August 6, 2011, Dufour sustained bodily injury and property damage in a motorcycle accident for which an underinsured motorist was at fault. Dufour's Dairyland policy included a bodily injury limit of $100,000 for underinsured motorists and a separate property damage limit of $40,000. American Standard Insurance Company of Wisconsin (American Standard) insured the tortfeasor, with a bodily injury limit of $100,000.
¶ 6. As a result of the accident, Dairyland paid Dufour $100,000 as its underinsured motorist bodily injury policy limit. American Standard also paid Du-four $100,000 pursuant to its bodily injury policy limit. It is undisputed that Dufour's bodily injuries arising out of the accident were in excess of $200,000. In addition to bodily injury proceeds, Dairyland paid *320 Dufour $15,589.86, which was agreed upon as the full amount of property damage Dufour sustained.[3]
f 7. After Dairyland and American Standard paid Dufour, Dairyland sought subrogation from American Standard for the property damages it paid to Dufour. Dufour's Dairyland policy included a subrogation clause that provided, "[ajfter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." American Standard paid Dairyland $15,559.86 on this subrogation claim.[4]
¶ 8. Dufour contacted Dairyland, requesting payment of the funds it received on its subrogation claim, based on Wisconsin's made whole doctrine. His request stated in relevant part: *321 Dufour's December 2, 2011 letter to Dairyland. Dairy-land responded to Dufour's request, disputing that he was entitled to further payments from Dairyland:
*320 Dennis Dufour [] is entitled to the full amount recovered for property damage by Dairyland Insurance from American [Standard]. Valley Forge Insurance Co. v. Home Mutual Insurance Co., 133 Wis. 2d 364, 396 N.W.2d 348 ([Ct. App.] 1986) held that an insurer of an automobile accident victim was not entitled to subro-gation for property damage paid to victim, when the insured is not fully compensated for his damages. This ruling follows longstanding law in Wisconsin regarding subrogation, see Garrity v. Rural Mutual Insurance Co., 77 Wis. 2d 537, 253 N.W.2d 512 (1977) and Rimes v. State Farm Mutual Automobile Insurance Co., 106 Wis. 2d 263, 316 N.W.2d 348 (1982). Subrogation is to be allowed only when the insured is compensated in full by recovery from the tortfeasor.
*321 Mr. Dufour has been paid all limits to which he is entitled. Mr. Dufour has no right to Dairyland Insurance's claim for subrogation related to property damage. Accordingly, we are denying your claim.
Dairyland's March 13, 2012 letter to Dufour.
¶ 9. Based on Dairyland's refusal, Dufour amended his complaint, alleging that Dairyland breached its insurance contract and acted in bad faith by unreasonably failing to turn over the funds it received in subrogation. Relying on Valley Forge, the circuit court granted Dufour's motion for summary judgment with respect to turnover of the funds from Dairyland's subrogation claim. However, the circuit court agreed with Dairyland with respect to bad faith, concluding that Dairyland did not unreasonably withhold the funds.
¶ 10. Both parties appealed, and the court of appeals affirmed the circuit court's grant of Dufour's motion for summary judgment because it concluded that Dufour had not been made whole for his bodily injuries and, therefore, Dairyland was not entitled to retain the funds it obtained as subrogation.[5] Further, the court of appeals held that Dairyland acted in bad faith in light of its obligations under the made whole doctrine and remanded for a determination of damages for Dufour's bad faith claim.[6]
¶ 11. We granted Dairyland's petition for review.
*322 II. DISCUSSION
A. Standard of Review
f 12. We review grants of summary judgment independently, applying the same methodology as the circuit court and the court of appeals, while benefitting from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶ 16, 360 Wis. 2d 129, 857 N.W.2d 136. "The standards set forth in Wis. Stat. § 802.08 are our guides." Id. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2013-14).
¶ 13. Our review requires us to determine the applicability of the made whole doctrine to funds Dairyland recovered in subrogation from American Standard. This is a question of law that we review independently. Muller v. Society Ins., 2008 WI 50, ¶ 20, 309 Wis. 2d 410, 750 N.W.2d 1.
B. Subrogation
f 14. Dairyland's insurance policy expressly provides: "[a]fter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." Accordingly, we determine whether, because Dufour was not made whole for his bodily injury, Dairyland is precluded by law from retaining funds *323 American Standard paid to it as subrogation for the property damages Dairyland paid to Dufour. Prior to undertaking our discussion of the made whole doctrine's applicability to Dufour's claim, we first address the law of subrogation, generally.
1. General subrogation principles
¶ 15. Subrogation is the "substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary 1563-64 (9th ed. 2009). Contractual subro-gation and equitable subrogation both exist under Wisconsin law.[7] Jindra v. Diederich Flooring, 181 Wis. 2d 579, 601, 511 N.W.2d 855 (1994). With either type of subrogation, equities affect the asserted right to subrogation when it is presented by an insurance company. Garrity v. Rural Mut. Ins. Co., 77 Wis. 2d 537, 540-41, 253 N.W.2d 512 (1977). Recently, we summarized subrogation in an insurance context where we applied equitable principles to a contractual right of subrogation:
[S]ubrogation is a purely derivative right that permits an insurer who has been contractually obligated to satisfy a loss created by a third party to step into the shoes of its insured and to pursue recovery from the responsible wrongdoer. . . . The doctrine of subroga *324 tion enables an insurer that has paid an insured's loss pursuant to a policy of property insurance to recoup that payment from the party responsible for the loss.
Muller, 309 Wis. 2d 410, ¶ 22 (internal citations omitted).[8]
¶ 16. Subrogation avoids unjust enrichment because it precludes double payment for the same loss. Id., ¶ 29. Moreover, "[s]ubrogation rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." Garrity, 77 Wis. 2d at 541. Therefore, subrogation balances equities between parties by precluding the insured from recovering twice for the same loss while compelling payment by the tortfeasor who caused the harm in the first instance. Muller, 309 Wis. 2d 410, ¶ 24.
¶ 17. Further, we repeatedly have emphasized the fact-specific and equitable nature of subrogation. See, e.g., id., ¶ 26 (recognizing that subrogation is "heavily influenced by particular facts"); Vogt v. Schroeder, 129 Wis. 2d 3, 12, 383 N.W.2d 876 (1986) (stating that "subrogation is an equitable doctrine and depends upon a just resolution of a dispute under a particular set of facts"); Rimes, 106 Wis. 2d at 271 (acknowledging that "subrogation is based upon equitable principles").
*325 ¶ 18. We have identified three non-exhaustive, equitable principles that may affect subrogation: " (1) ensuring that the plaintiff is fully compensated for loss; (2) preventing unjust enrichment; and (3) ensuring that the wrongdoer is held responsible for his conduct and not allowed to go scot-free by failing to respond to damages while another, the plaintiffs insurer, is required to do so." Muller, 309 Wis. 2d 410, ¶ 60 (citing Vogt, 129 Wis. 2d at 13). We now turn to discuss the made whole doctrine both generally and in some detail.
2. Made whole doctrine
a. made whole, generally
¶ 19. Ensuring that the insured is fully compensated for his loss is the essence of the made whole doctrine. Namely, "equity provides that subrogation ordinarily does not arise until the underlying debt or loss has been paid in full. This 'antisubrogation rule' is known as the made whole doctrine." Id., ¶ 25 (citations omitted). The made whole doctrine attempts to " [b]alanc[e] the insurer's right to recoup benefits it has paid against an insured's right to obtain full compensation." Id.
¶ 20. Our decisions demonstrate that the made whole doctrine is but one consideration in determining whether an insurer is entitled to subrogation. Vogt, 129 Wis. 2d at 13 (recognizing "distinct and separate equitable poliches]" in considering subrogation); Muller, 309 Wis. 2d 410, ¶ 60 (" [T]he made whole doctrine is not applicable in all situations, and thus the test of *326 'wholeness' stated in Rimes is not the sole criterion for determining whether an insurer may pursue its sub-rogation interest"). Stated otherwise, an insurer is not always precluded from retaining funds obtained as subrogation for payments the insurer previously made simply because the insured has not been fully compensated for the loss. Rather, the specific facts and equities dictate whether the made whole doctrine will apply to prevent an insurer from retaining funds received for its subrogation claim.
b. made whole, in detail
¶ 21. Because Garrity and Rimes are the foundation of the made whole doctrine, it is important to understand what they say and why, as well as to recognize the issues they did not address. The made whole doctrine embodies the principle that, " [ordinarily, subrogation does not arise until the debt [to the injured party] has been fully paid." Garrity, 77 Wis. 2d at 541. We explained in Garrity that the insurer "has no share in the recovery from the tort-feasor if the total amount recovered by the insured from the insurer does not cover his loss." Id. at 544. In Rimes, we also said:
The purpose of subrogation is to prevent a double recovery by the insured. Under circumstances where an insured has received full damages from the tortfea-sor and has also been paid for a portion of those damages by the insurer, he receives double payment — he has been made more than whole. Only under those circumstances is the insurer, under principles of equity, entitled to subrogation.
Rimes, 106 Wis. 2d at 272.
*327 ¶ 22. Subsequent to our initial setting out of the made whole doctrine, we recognized that both Garrity and Rimes presented the same factual scenario where equity drove our conclusion that the made whole doctrine applied. We explained:
The circumstances in each of those cases were substantially the same, and therefore the subrogation problem posed in each was subject to resolution by applying the same equitable principle to the facts— that the insured had a right to be made whole, but no more than whole. Hence, the insurer was to be subro-gated only if further recovery would do more than make the insured whole.
Vogt, 129 Wis. 2d at 13.
¶ 23. It is important to note that in both Garrity and Rimes, the insurer attempted to exercise its claim of subrogation against funds that otherwise would have gone to its insured. Id. at 14. Therefore, if the insurer had prevailed on its subrogation claim, the insured would not have been paid all that he had contracted to receive under his own policy. The issue in Garrity and Rimes may be summarized as one of priority: there was a limited pool of funds available, and the issue was whether the insurer or the insured enjoyed priority to those funds for which they were competing. Id. at 14-15.
¶ 24. For example, in Garrity, the insureds' barn sustained damages due to a negligently operated truck, and the insureds sought proceeds under both their own policy and the tortfeasor's policy.[9] Garrity, 77 Wis. 2d at 539. The insureds recovered the policy limit under their own policy, $67,227.12; however, damages *328 to the bam were in excess of $100,000. Id. Accordingly, the insureds also required proceeds under the tortfea-sor's insurance policy, which had a policy limit of $25,000, as they attempted to cover their loss. Id. at 543.
¶ 25. The insurer asserted a subrogation claim against the tortfeasor's policy limit of $25,000 to recoup part of the $67,227.12 that it had paid to its insureds. Id. at 540-41. Consequently, permitting the insurer's subrogation claim would have reduced the insureds' recovery by $25,000, thereby increasing the amount by which the insureds were not made whole. See Vogt, 129 Wis. 2d at 14-15. In concluding that the insureds maintained priority to the tortfeasor's $25,000 policy limit for which the insurer was competing, we stated that, "where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." Garrity, 77 Wis. 2d at 542.
f 26. Rimes involved an automobile accident where the insured sustained damages in excess of $300,000. Rimes, 106 Wis. 2d at 264-65. The insured received $9,649.90 from its insurer, State Farm Automobile Insurance Company, under medical-pay policy provisions in two State Farm policies, each with a $5,000 limit. Id. at 265-66. Subsequently, the insured stipulated to a $125,000 settlement with the tortfea-sors' insurers, which amount included $9,649.90 for medical-pay. Rimes was paid all but $9,649.90, which amount was paid into court subject to State Farms' subrogation claim. Id. at 267.
f 27. The circuit court held a mini-trial on damages, finding Rimes' total damages were $300,433.54, *329 of which past medical expenses were $26,560.70.[10] Id. at 268-69. In applying the made whole doctrine to preclude the insurer from accessing funds for which it was competing with its own insured, we stated that, " [u]nder Wisconsin law[,] the test of wholeness depends upon whether the insured has been completely compensated for all the elements of damages, not merely those damages for which the insurer has indemnified the insured." Id. at 275. In Rimes, the insured was not made whole for either medical-pay damages or for personal injury damages. Therefore, the insured was not required to disgorge amounts for which he was indemnified by his insurer. Id. at 276.
f 28. We subsequently clarified that the broad statements from Garrity and Rimes were to be applied only when the application of the made whole doctrine would yield an equitable result. Vogt, 129 Wis. 2d at 12. For example, in Vogt, the insured, who was the injured party in an automobile accident, suffered damages in excess of the tortfeasor's insurance policy's $15,000 limit of liability. Id. at 7. The tortfeasor's insurer offered to settle with the insured-injured party for its $15,000 policy limit in exchange for a release of the tortfeasor and the tortfeasor's insurer from any further liability. Id. at 8. Because the insured-injured party's damages exceeded the tortfeasor's $15,000 limit of liability, the insured also was entitled to recover under his own policy's $50,000 underinsured motorist coverage. Id. The insured-injured party's insurer refused to approve the settle *330 ment and release without preserving its right to subrogation, and the matter came before the circuit court for resolution. Id.
¶ 29. We explained in Vogt that our central inquiry was " [w]hether an automobile insurer which by the terms of its contract pays its own insured under the underinsured motorist coverage has a right of subrogation against the tortfeasor . . . once a payment has been made to its own insured." Id. at 15-16. In answering this question in the affirmative, we noted a "distinct and separate equitable [principle]" that is important when considering how the made whole doctrine is to function. Id. at 13. Specifically, we concluded that the tortfeasor should be held "responsible for his conduct and not [] allowed to go scot-free by failing to respond in damages." Id.
f 30. Notably, the issue in Vogt was not the same as the issue of priority that was presented in Garrity and Rimes where subrogation would have operated to reduce the insured's recovery to which he was entitled under his own policy. See id. at 15. Rather, in Vogt, there was no competition, and the insured maintained priority to all proceeds to which he was entitled under the tortfeasor's policy limit, as well as under his own policy. Id. at 17 — 18. In such a situation, it would have been inequitable to allow the insured unilaterally to prevent his insurer from seeking subrogation from the tortfeasor, and thereby hold the tortfeasor accountable if subrogation would have no discernible effect on the insured's recovery. See id. at 17-19. Consequently, we declined to apply the made whole doctrine to prevent the insurer from seeking subrogation from the tortfea-sor. Id. at 19.
¶ 31. In Mutual Service, we further explained the independent nature of subrogation claims and *331 their connection to the made whole doctrine. We clarified that an insurer who pays a claim to its insured for which a tortfeasor is responsible has a derivative, but separate claim against the tortfeasor and the tortfea-sor's insurer. "In such a situation, we have characterized the interests of the insurer and the insured as each owning separately a part of the claim against the tortfeasor." Mut. Serv. Cas. Co. v. Am. Family Ins. Grp., 140 Wis. 2d 555, 561, 410 N.W.2d 582 (1987).
f 32. In Mutual Service, we held that when an insurer maintains a separate subrogation claim against the tortfeasor, the made whole doctrine as articulated in Garrity and Rimes is inapplicable if the claim is "brought by a subrogated insurer against the tortfeasor or the tortfeasor's insurer where the subro-gated insurer's insured has previously settled with the tortfeasor." Id. at 563-64. As with Vogt, we did not apply the made whole doctrine to preclude the insurer's claim for subrogation. See id. It is important to note that in the absence of the insurer's success on its subrogation claim, there would not have been any funds that the insured could seek to collect after having recovered under her own policy as well as under the settlement agreement with the tortfeasor. See id.; see also Vogt, 129 Wis. 2d at 17-19.
¶ 33. In Schulte v. Franzin, 176 Wis. 2d 622, 500 N.W.2d 305 (1993), a medical malpractice action, we examined a settlement that permitted Schulte, through an indemnification agreement among Schulte, the tortfeasor and the tortfeasor's insurer, to unilaterally defeat the insurer's subrogation claim against the tortfeasor and his insurer. Id. at 625. There, Schulte received $90,000 in medical payments from her insurer, Compcare Health Services Insurance Corporation. Id. at 625-26. Schulte then settled with the *332 tortfeasor and the tortfeasor's insurer for $2,460,000. Id. at 626. As part of the settlement, Schulte agreed to indemnify the tortfeasor and the tortfeasor's insurer for any further liability they incurred from the medical malpractice. Id. at 626-27.
¶ 34. Schulte then moved to extinguish Comp-care's subrogation lien and requested a Rimes hearing. Id. Because of the indemnification agreement, Compcare, who was not consulted prior to Schulte's settlement, found itself in competition with Schulte over the funds she had received. Id. at 633-34 (" [A]n indemnification agreement indirectly creates the prospect that the insurer will be competing with its own insured.").
¶ 35. At the Rimes hearing, the circuit court found that Schulte's damages were between $2,950,000 and $4,790,000 and therefore, Schulte had not been made whole by the settlement. Id. at 627. If Compcare prevailed on its subrogation claim that arose from the $90,000 it paid Schulte in medical-pay, Schulte would have been required to indemnify the tortfeasor for that amount. See id. Therefore, the recovery to which she was entitled under her own insurance policy would have been reduced by $90,000, for which coverage Schulte had paid a premium. See id. Consequently, we concluded that the circuit court correctly applied the made whole doctrine when it extinguished Compcare's subrogation claim due to the indemnification agreement. Id. at 633-35.
¶ 36. Most recently, we considered the applicability of the made whole doctrine in Muller, where the pool of money available was sufficient to fully satisfy the injured parties' losses and the subrogation claim of their insurer. The Mullers' property was destroyed by a fire, resulting in damages of $697,981.58. Muller, 309 *333 Wis. 2d 410, ¶ 5. The Mullers' insurer, Society Insurance, paid them $407,378.88, Society's policy limit. This payment left the Mullers uncompensated by $290,602.70. Id., ¶ 6. The tortfeasor was insured under a United Fire and Casualty policy with a liability limit of $1,000,000. Id., f 5.
f 37. Although the tortfeasor's United policy was sufficient to cover the remaining loss, the insureds voluntarily settled with the tortfeasor for $120,000. Id., f 11. The settlement agreement contained no indemnification obligation for the Mullers. Id., ¶ 12. Subsequently, Society and United settled Society's subrogation claim for $190,000. Id. The Mullers then argued that they were entitled to receive the remainder of their loss from those funds, as they had not yet been made whole. Id., f 13.
¶ 38. We set forth the issue as follows:
[WJhether an insurer may retain in full a subrogation settlement with a tortfeasor and a tortfeasor's insurer after its insureds have settled with the tortfeasor and the tortfeasor's insurer for an amount less than necessary to make the insureds "whole," even though the tortfeasor's insurance policy limits were sufficient to cover all claims, including those of both the insureds and the insurer.
Id., f 2. Given the equities created by the facts of the case, we did not apply the made whole doctrine, which would have deprived the insurer of its subrogation rights. Instead, we held that Society had fulfilled all of its obligations under its insurance policy by paying the Mullers' policy limits, by not competing with the Mull-ers for a limited pool of funds and had done nothing to otherwise reduce the Mullers' recovery. Id., f 4.
1 39. Additionally, we acknowledged that an insurer has a separate subrogation claim against the *334 tortfeasor, which the insurer was entitled to pursue as long as it recognized the priority of the insureds to available funds, which Society did. Id., ¶ 72.
¶ 40. Even though the Mullers were not made whole,[11] they received all benefits under their own insurance policy for which they bargained and all benefits from their settlement agreement with the tortfeasor. Id., ¶ 70. Had Society chosen not to pursue its subrogation claim, the Mullers would not have had access to any additional monies after collecting under both their policy with Society and the settlement agreement with United. Id., f 86. Therefore, we concluded that it would have been inequitable to allow the Mullers to prevent their insurer, Society, from retaining funds received on its subrogation claim and "would discourage subrogees from pursuing their subrogation rights." Id.
f 41. We now consider the court of appeals' Valley Forge decision, upon which both the circuit court and court of appeals relied when denying Dairy-land's retention of funds it recovered in subrogation from the tortfeasor's insurer. There, the insured, Samuel Mcllrath, was injured in an automobile accident and also sustained property damage to his vehicle. Valley Forge, 133 Wis. 2d at 366. Mcllrath maintained a Valley Forge automobile insurance policy with collision coverage, under which Valley Forge paid approximately $6,000 for property damages. Id. at 366-67. The tortfeasor, Joseph E. Ropson, maintained an insurance policy with Home Mutual, which provided separate policy limits for bodily injury and property damage. Id. at 366.
*335 ¶ 42. Pursuant to the settlement agreement, Home Mutual paid Mcllrath and two passengers who were injured its bodily injury policy limits, with Mcllrath receiving $25,000. Id. Home Mutual also paid Mcllrath $6,000 in property damage. Id. at 366-67. It was undisputed that Mcllrath's bodily injury damages exceeded $25,000 and that he was paid twice for his property damage, once by Valley Forge and once by Home Mutual. Id. at 367, 369. Further, the property damage payment was made directly to Mcllrath, rather than to Valley Forge, at the direction of Mcllrath's attorney. The settlement agreement also required Mcllrath to indemnify Home Mutual from any claims made against it or the tortfeasor by Valley Forge. Id. at 367. This placed Valley Forge's subrogation claim in direct competition with the recovery of its insured. See Schulte, 176 Wis. 2d at 633-34.
¶ 43. Valley Forge sued Home Mutual, its insured, Ropson, and Mcllrath, asserting a subrogation claim based on its previous $6,000 property damage payment to Mcllrath. The subrogation claim of Valley Forge against Home Mutual and Ropson, if successful, would have taken $6,000 from Mcllrath due to Mcllrath's indemnification obligation to Home Mutual and Ropson under the settlement agreement. This would have caused Mcllrath's first-party claim against Valley Forge to become unfunded.[12]
¶ 44. Rejecting the insurer's claim to recoup the subrogated property damage funds from its own insured through the operation of the indemnification *336 provision in the settlement agreement, the court of appeals over simplified the issue as whether the insurer or the insured should go unpaid, and concluded that "the loss should be borne by the insurer for that is a risk the insured has paid it to assume." Valley Forge, 133 Wis. 2d at 369-70 (quoting Garrity, 77 Wis. 2d at 542). In so doing, the court of appeals overlooked the equities affecting Valley Forge and whether Mcllrath was entitled to pursue subrogated property damage funds from Home Mutual in the first instance because he had been fully paid for that claim by Valley Forge.[13]
¶ 45. Moreover, the court of appeals missed the import of the indemnity provision in the settlement agreement to the equities that related to the insurer, even though in Vogt we pointed out similar equitable issues to that which an indemnity agreement can raise. Instead of paying heed to what we had said about the equities that affect subrogation, the court of appeals dismissed our decision in Vogt as "inapposite" to the issues presented in Valley Forge. Id. at 369.
¶ 46. By so doing, the court of appeals failed to consider the equitable bases upon which we refused to enforce full releases of the tortfeasor and his insurer required by the settlement offer in Vogt and how those equities would have been implicated as the court of appeals considered the indemnity provision of the *337 settlement agreement in Valley Forge. As we carefully explained in Vogt, when the insured has received payment under his own policy and an opportunity to settle with the tortfeasor and the tortfeasor's insurer, "a just result" puts the ultimate burden on the tort-feasor, not on the insurer who has paid a first-party claim in full under its contract with its insured. Vogt, 129 Wis. 2d at 19.
¶ 47. More specifically, in Vogt, we examined contentions that related to a settlement agreement that required full releases of the tortfeasor and his insurer by the injured party: (1) payment to the injured party of $15,000, the tortfeasor's policy limits; (2) release of the tortfeasor from any obligation for damages he caused; and (3) termination of the insurer's subrogation rights. Id. at 8. After balancing the equities among the parties, we did not terminate the insurer's subro-gation claim. Rather, we offered the insurer the choice of paying its insured's first-party claim from the $50,000 of underinsured motorist coverage[14] and then pursuing the tortfeasor for payment in subrogation or paying its insured's first-party claim and accepting the settlement if the insurer determined that the tortfea-sor was not collectable and, therefore, not worth pursuing. Id. at 26.
¶ 48. Given the record before us, we were unsure whether the tortfeasor was collectable; therefore, we remanded the matter to the circuit court to give the insurer sufficient time to decide how it would proceed. Id. Importantly, the balance we effected did not put the insurer in competition with its own insured and per *338 mitted the insurer to hold the tortfeasor responsible for the damages he had caused.
3. Application: made whole or subrogation
¶ 49. We conclude that, given the facts presented in the instant case, the made whole doctrine does not apply to preclude Dairyland from retaining funds obtained in subrogation even though Dufour has not recovered all of his bodily injury damages flowing from the accident. First, Dairyland fully paid Dufour its bodily injury policy limit of $100,000 as well as 100% of the damage to his motorcycle under its property damage provision. As with Muller, these proceeds constituted every dollar to which Dufour was entitled under his contract of insurance with Dairyland. See Muller, 309 Wis. 2d 410, ¶ 70. Had Dufour wished to insure himself against greater bodily injury losses, he could have paid a higher premium for higher policy limits.
¶ 50. Second, Dufour also had priority in recovering from the tortfeasor's policy, as required by Garrity, wherein he was paid the policy limit of $100,000 for bodily injury. Garrity, 77 Wis. 2d at 542-43. Dairyland permitted Dufour to recover all benefits to which he was entitled under both policies before it pursued its separate subrogation claim against the tortfeasor's insurer. Third, by waiting until Dufour recovered all available proceeds under both insurance policies, Dairyland was not in competition with Dufour for a limited pool of funds. As Dufour acknowledges, but for Dairyland's subrogation action against the tortfeasor's insurer, Dufour would have no access to any additional funds from either insurer. Consequently, allowing Dairyland to *339 seek and obtain subrogation had no effect on Dufour's recovery. Muller, 309 Wis. 2d 410, ¶ 4.
¶ 51. Therefore, the equities presented favor Dairyland, which has wholly fulfilled its contractual obligations to Dufour. Dufour purchased two types of insurance coverage that are relevant here: bodily injury and property damage. Each coverage type gave rise to a separate premium, a separate policy limit and a separate description of the kind of damage for which it would indemnify Dufour. He exhausted his underin-sured motorist bodily injury policy limit and now is attempting to tap into his property damage policy limit in order to satisfy his remaining bodily injury losses. We decline to rewrite Dairyland's policy to provide for lump sum coverage where such coverage was not contemplated by the parties. Brethorst v. Allstate Prop. & Cas. Ins. Co., 2011 WI 41, ¶ 68, 334 Wis. 2d 23, 798 N.W.2d 467 (declining to rewrite insurance policy "to bind an insurer to a risk which it did not contemplate and for which it was not paid"); Maxwell v. Hartford Union High Sch. Dist., 2012 WI 58, ¶¶ 34-35, 341 Wis. 2d 238, 814 N.W.2d 484 (emphasizing importance of both insurers and insureds receiving the benefit of their bargain as premiums are based on risk assessment). Although we are sympathetic to Dufour's personal injuries for which he was not made whole, preventing an insurer from pursuing its subrogation claim for property damage payments under circumstances such as presented herein would not solve the problem of underinsurance for personal injuries.[15]
¶ 52. Finally, although we have serious concerns about the court of appeals decision in Valley Forge and *340 caution against its use, given our discussions in Vogt, subsequent cases and herein, we do not overrule Valley Forge. The holding in Valley Forge requires a settlement agreement whereby the injured party becomes obligated to indemnify the tortfeasor and its insurer for any award the injured party's insurer obtains in subrogation. Such an agreement sets up the potential for competition for a limited pool of funds between the insurer and its insured. Schulte, 176 Wis. 2d at 633-34. There is no indemnification agreement here, no potential competition for a limited pool of funds and no potential to apply Valley Forge.
C. Bad Faith
¶ 53. A bad faith claim is a separate and distinct cause of action from an insured claiming that the insurer breached its insurance contract. Brethorst, 334 Wis. 2d 23, ¶ 23. Bad faith sounds in tort, not in contract, and it constitutes "a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." Anderson v. Cont'l Ins. Co., 85 Wis. 2d 675, 687, 271 N.W.2d 368 (1978).
¶ 54. In order to prevail on a bad faith claim, an insured must establish three elements. Brethorst, 334 Wis. 2d 23, ¶¶ 49, 65 (citing Weiss v. United Fire & Cas. Co., 197 Wis. 2d 365, 377, 541 N.W.2d 753 (1995) and Benke v. Mukwonago-Vernon Mut. Ins. Co., 110 Wis. 2d 356, 362, 329 N.W.2d 243 (Ct. App. 1982)). The insured must show all of the following: First, "that there is no reasonable basis for the insurer to deny the insured's claim for benefits under the policy." Id. *341 Second, "that the insurer knew of or recklessly disregarded the lack of a reasonable basis to deny the claim." Id. Third, "some breach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured." Id., ¶ 65.
¶ 55. As we have explained above, Dairyland paid Dufour every dollar to which he was entitled under its policy. Therefore, Dairyland did not breach its insurance contract. That Dairyland sought and obtained subrogation for payments it made to Dufour is not in contravention of the parties' contract. Quite to the contrary, Dairyland's policy specifically provided, " [a]fter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." As insurer of the tortfeasor, American Standard was a person who may be held responsible for the tortfeasor's negligence and it was from American Standard that Dairyland obtained subrogation. Accordingly, we conclude that Dairyland did not act in bad faith by retaining the funds it obtained as subrogation.
III. CONCLUSION
f 56. We conclude that the made whole doctrine does not apply to preclude Dairyland from retaining the funds it received from its subrogation claim because the equities favor Dairyland: (1) Dairyland fully paid Dufour all he bargained for under his Dairyland policy, which included the policy's limits for bodily injury and 100% of Dufour's property damage; (2) Dufour had priority in settling with the tortfeasor's insurer; and (3) if Dairyland had not proceeded on its subrogation claim, Dufour would *342 have had no access to additional funds from the tortfeasor's insurer. We further conclude that Dairy-land did not act in bad faith with respect to Dufour's demand for the funds Dairyland obtained as subrogation for the property damages it paid Dufour. Accordingly, we reverse the court of appeals decision in all respects.
By the Court. — The decision of the court of appeals is reversed.

 Dufour v. Progressive Classic Ins. Co., No. 2014AP157, unpublished slip op. (Wis. Ct. App. July 16, 2015).

 The Honorable Brian A. Pfitzinger of Dodge County presided.

 Some portions of the record indicate that the settlement was in the amount of $15,589.85.

 The record is unclear as to why Dairyland received $30 less than the property damage amount that it paid to Dufour. Both parties acknowledge this discrepancy, and it is unimportant to our decision.

 Dufour, unpublished slip op., ¶ 26.

 Id., ¶ 36.

 Contractual subrogation has been referred to as "conventional subrogation." Jindra v. Diederich Flooring, 181 Wis. 2d 579, 601, 511 N.W.2d 855 (1994). Equitable subrogation has been referred to as "common law subrogation." Garrity v. Rural Mut. Ins. Co., 77 Wis. 2d 537, 541, 253 N.W.2d 512 (1977).

 Mullers' contract with Society contained a subrogation clause with language providing for recoupment of payment by Society. Muller v. Society Ins., 2008 WI 50, ¶ 71, 309 Wis. 2d 410, 750 N.W.2d 1.

 Both the insured and the tortfeasor maintained insurance policies with the same insurance company.

 This type of evidentiary hearing on damages has become known as a Rimes hearing or a made whole hearing. Schulte v. Frazin, 176 Wis. 2d 622, 627, 500 N.W.2d 305 (1993).

 There was no Rimes hearing, but the parties agreed that Mullers were not made whole by the payments they received.

 A first-party claim in an insurance context is a claim made by the insured on his contract of insurance with his insurer, as distinguished from the situation in which a third party sues an insurer. Brethorst v. Allstate Prop. & Cas. Ins. Co., 2011 WI 41, ¶¶ 23-24, 334 Wis. 2d 23, 798 N.W.2d 467.

 As we have explained, one cause of action may arise out of an automobile accident, but it can contain two claims: one for property damage and one for personal injury. Borde v. Hake, 44 Wis. 2d 22, 29, 170 N.W.2d 768 (1969). Subsequent to the insurer's payment of the insured's property damage, the insurer and its insured have common ownership of that claim. Id. at 28; see also Heifetz v. Johnson, 61 Wis. 2d 111, 122, 211 N.W.2d 834 (1973) (withdrawing dicta from Borde relative to statute of limitations effect of failing to name subrogated insurer).

 "There is nothing in the record to show the total amount of damages to which Vogt may be entitled." Vogt v. Schroeder, 129 Wis. 2d 3, 7, 383 N.W.2d 876 (1986).

 Insurers would not proceed on their subrogation claims were they not able to retain the funds awarded from those claims.