BRENNAN, J.
*331 *525 ¶ 1 Antoinette Lang and Jim Lang appeal an order of the trial court that granted the defendants' summary judgment motion dismissing the Langs' claim against Fryed Audio, LLC (Fryed) for negligence.
¶ 2 Antoinette Lang was injured when she tripped over electrical cords at an outdoor festival featuring food and music. The Langs sued Fryed, the LLC that provided the sound engineering services to a band at the event, for negligently placing the cords. The Langs sued other entities as well, including the Lions Club of Cudahy Wisconsin, Inc., the organization that obtained the permit for the use of the grounds and ran the event. The trial court granted the Lions Club's motion for summary judgment on the grounds that the recreational immunity statute, WIS. STAT. § 895.52 (2015-16), barred the Langs' negligence claim against that defendant.[1] The issue before us is whether Fryed is also entitled to immunity under the recreational immunity statute either as an "agent" of the Lions Club or as an "occupier."[2]
*526 ¶ 3 The trial court concluded that Fryed is entitled to immunity and granted summary judgment in its favor; in its oral ruling, the trial court cited to Carini v. ProHealth Care, Inc. , 2015 WI App 61, 364 Wis.2d 658, 869 N.W.2d 515, and Leu v. Price County Snowmobile Trails Ass'n, Inc. , 2005 WI App 81, 280 Wis.2d 765, 695 N.W.2d 889. In Carini , this court concluded that the immunity statute barred a similar negligence claim where the issue was a question of whether the allegedly negligent cord placement was related to the condition or maintenance of the land.[3] In Leu , this court concluded that two nonprofit snowmobile groups were occupiers of the property such that they qualified as "owners" for purposes of WIS. STAT. § 895.52 immunity. Leu and Carini are distinguishable from the facts of this case and their holdings are not applicable. We are persuaded that the cases that govern the analysis are the Wisconsin Supreme Court's recent interpretations of the statute in Westmas v. Creekside Tree Service, Inc. , 2018 WI 12, 379 Wis.2d 471, 907 N.W.2d 68, and Roberts v. T.H.E. Insurance Co. , 2016 WI 20, 367 Wis.2d 386, 879 N.W.2d 492, both decided after Carini and Leu .
¶ 4 Fryed argues that it is entitled to immunity as an "agent" of the Lions Club, the entity that ran the festival. Fryed also argues that it is entitled to immunity *527 as an "occupier" of the property. Applying the tests set forth in Westmas and following our supreme court's analysis in that case, we conclude that Fryed was not an "agent" for purposes of the recreational immunity statute because "an agent ... is subject to reasonably precise control by the principal." See id. , 379 Wis.2d 471, ¶ 36, 907 N.W.2d 68. This requires *332 "reasonably precise specifications" from the principal to the "agent," and "absent 'reasonably precise specifications' ... there could be neither control nor the right to control the conduct that caused the injury." See id. , ¶¶ 34, 36 (quoting Showers Appraisals, LLC v. Musson Bros., Inc. , 2013 WI 79, ¶ 37, 350 Wis.2d 509, 835 N.W.2d 226 ). Here, as in Westmas , there is no evidence that Fryed "was following [the owner's] specific directions" when it placed the cords in a pedestrian area-in this case, the cord placement is the "injury-causing conduct." See id. , ¶ 37. Because there is no evidence of the requisite "reasonably precise specifications," the owner in this case neither "controlled [n]or had the right to control the details" of Fryed's work, and there is no dispute that the owner left the "means and methods" for conducting the setup, "including any safety precautions," to Fryed. See id. , ¶¶ 37, 38, 40 (citation omitted). The analysis set forth in Westmas precludes granting immunity to Fryed as an "agent."
¶ 5 We also conclude that Fryed was not an "occupier" of the property because "its presence on the property exhibited no 'degree of permanence, as opposed to mere use.' " Id. , ¶¶ 3, 46. In his capacity as principal of Fryed, Steven Fry was present on the property on Saturday, August 4, 2012, and Sunday, August 5, 2012, only to set up and take down sound equipment for performances. Focusing on the purpose of the statute, our supreme court has, as part of its *528 analysis of a party's eligibility for immunity, given consideration to whether granting immunity to a party as an "occupier" would "further the policy which underlies the statute." Id. , ¶ 47. In considering this, the court asks whether the "property was already open for public recreational purposes" and whether, regardless of a party's immunity, the owner of the property is "protected and would therefore not be discouraged from opening its land to the public." Id. (quoting Roberts , 367 Wis.2d 386, ¶ 35, 879 N.W.2d 492 ). Fryed had no "effect on whether [the owner's] property would be open to the public for recreational purposes," id. , ¶ 48, and had no role in opening the land to the public. Other entities opened the land, and the public would have had access to the land regardless of what contractor set up the sound equipment.
¶ 6 We therefore reverse the trial court's order and remand for further proceedings.
BACKGROUND
¶ 7 As set forth in a previous opinion from this court on this case,[4] the facts about the underlying injury are not disputed:
While she was at an outdoor festival, Antoinette Lang ... tripped and fell and was injured. In March 2014, Lang and her husband brought a negligence claim against several defendants and their insurers, alleging that the cause of the fall was the negligent placement of electrical cords in a pedestrian area. The defendants were the Lions Club, which had contracted with Milwaukee County to use Cudahy Park for the *529 festival; Rhythm Method, the band who had used the electrical cords in question for their performance in the festival; and Fryed Audio, LLC, the contractor who set up sound and lighting for the performance.
¶ 8 At this point, Fryed is the sole remaining defendant. Although Fryed and the Langs characterize the roles of Fryed *333 and the Lions Club differently according to their respective positions, there is no dispute regarding any material fact relevant to the determination of Fryed's statutory immunity. Lang fell while walking to a table after getting some food. The handwritten accident report created by the Lions Club stated that it occurred in the "west end of [the] band tent" and that Lang "tripped over sound cords between [the band's] sound board and the west stage[.]" Lions Club member Frank Miller has for ten years served as the festival's co-chair and a main contact for vendors, signing contracts related to the festival and overseeing the set-up. Miller testified at deposition that each year on the Friday before the annual festival opens, he does "a walk-through to look at the grounds and see if there's any issues" of concern to him. He testified that in some years, other Lions Club members accompany him on the pre-festival walk-through though he had no memory of whether that happened in 2012. Miller was asked whether, in 2012, the Lions Club had "any prohibitions or specific instructions, or directives as to how [those who set up the bands' equipment] [a]re supposed to run their wires from that sound board in the middle of the tent to the stage at that time which they're performing?" He answered, "No, we did not." He also explained that the Lions Club had no contract with the sound companies and contracted only with the bands. *530 ¶ 9 Fryed's principal, Steven Fry, was the person who set up the band's sound equipment and laid the electrical cords on which Lang later tripped. He described the process of connecting the band's equipment to the power stations at the festival. He was asked in his deposition whether the Lions Club "provide[d] any instruction" at the festival "in terms of how [he was] supposed to set up [the] sound equipment[.]" He answered, "[T]hey did not."
¶ 10 At the hearing on Fryed's summary judgment motion, Fryed argued that the case was governed by Carini . The Langs argued that our supreme court's holding in Roberts and this court's opinion in Westmas , which was at that time pending review by our supreme court, precluded immunity for Fryed. In the alternative, they argued that a factual dispute on the issue of agency precluded summary judgment. The trial court agreed with Fryed and granted summary judgment.
DISCUSSION
I. Standard of review.
¶ 11 This case requires us to review the order for summary judgment that granted judgment on the Langs' claims against Fryed. We review a grant or denial of summary judgment independently, applying the same standard employed by the trial court. Dufour v. Progressive Classic Ins. Co. , 2016 WI 59, ¶ 12, 370 Wis.2d 313, 881 N.W.2d 678. Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party has established his or her right to judgment as a matter of law. WIS. STAT. § 802.08(2) ; Wadzinski v. Auto-Owners Ins. Co. , 2012 WI 75, ¶ 10, 342 Wis.2d 311, 818 N.W.2d 819.
*531 ¶ 12 Here, the material facts are not disputed. Accordingly, we focus on whether the application of WIS. STAT. § 895.52 to undisputed facts bars the Langs' claims. Statutory interpretation and application are questions of law that we review independently while benefitting from the analyses of the trial court. Highland Manor Assocs. v. Bast , 2003 WI 152, ¶ 8, 268 Wis.2d 1, 672 N.W.2d 709. Accordingly, the legal question for us to answer is whether Fryed falls into either of the statutory categories-"owner" or "agent"-such that it is shielded from liability. See *334 Westmas , 379 Wis.2d 471, ¶ 25, 907 N.W.2d 68 (stating that the court "determine[s] whether [a party] fits the statutory meaning of agent or ... whether [a party] was a statutory occupier of recreational land such that it, too, is protected by the provisions of § 895.52"). See also id. , ¶ 36 (applying principles of law to the facts to reach a legal conclusion as to agency).
¶ 13 The purpose of statutory interpretation is to determine what the statute means so that it may be properly applied. State ex. rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 44, 271 Wis.2d 633, 681 N.W.2d 110. Statutory interpretation begins with the language of the statute. Id. , ¶ 45. "If the words chosen for the statute exhibit a 'plain, clear statutory meaning,' without ambiguity, the statute is applied according to the plain meaning of the statutory terms." State v. Grunke , 2008 WI 82, ¶ 22, 311 Wis.2d 439, 752 N.W.2d 769 (quoting Kalal , 271 Wis.2d 633, ¶ 46, 681 N.W.2d 110 ). However, where the statute is "capable of being understood by reasonably well-informed persons in two or more senses[,]" the statute is ambiguous. Kalal , 271 Wis.2d 633, ¶ 47, 681 N.W.2d 110.
*532 ¶ 14 If we determine that the language of WIS. STAT. § 895.52 is ambiguous, we may then consult extrinsic sources, such as legislative history. Kalal , 271 Wis.2d 633, ¶ 50, 681 N.W.2d 110. However, even where the statutory language bears a plain meaning, "we nevertheless may consult extrinsic sources 'to confirm or verify a plain-meaning interpretation.' " Grunke , 311 Wis.2d 439, ¶ 22, 752 N.W.2d 769 (quoting Kalal , 271 Wis.2d 633, ¶ 51, 681 N.W.2d 110 ).
II. Statute and relevant law.
¶ 15 "In 1983, the Wisconsin legislature enacted WIS. STAT. § 895.52, which dramatically expanded liability protection for landowners who open their private property for public recreational use." Westmas , 379 Wis.2d 471, ¶ 21, 907 N.W.2d 68. The recreational immunity statute provides that "no owner and no officer, employee or agent of an owner is liable for ... any injury to ... a person engaging in a recreational activity on the owner's property[.]" Sec. 895.52(2).[5]
¶ 16 "The policy behind the statute is to encourage property owners to open their lands for recreational activities by removing a property user's potential cause of action against a property owner's alleged negligence." Kautz v. Ozaukee Cty. Agric. Soc'y , 2004 WI App 203, ¶ 9, 276 Wis.2d 833, 688 N.W.2d 771. "In order to achieve the goal of encouraging property owners to open their lands to public recreation by *533 limiting the liability of property owners, courts must liberally construe the statute in favor of property owners." Id.
¶ 17 In 1983 Wis. Act 418, § 1, the legislature set forth the purpose of the statute: "The legislature intends by this act to limit the liability of property owners toward others who use their property for recreational activities under circumstances in which the owner does not derive more than a minimal pecuniary benefit."
¶ 18 "As our cases have explained, 'the impetus for this law is the continual shrinkage of the public's access to recreational land in the ever more populated modern world.' " Westmas , 379 Wis.2d 471, ¶ 22, 907 N.W.2d 68 (quoting Roberts , 367 Wis.2d 386, ¶ 28, 879 N.W.2d 492 ). "The *335 legislature explained that the statute is to be 'liberally construed in favor of property owners to protect them from liability.' " Id. (emphasis added) (citing Ervin v. City of Kenosha , 159 Wis.2d 464, 476, 464 N.W.2d 654 (1991) ). "Accordingly, courts have interpreted the protections of WIS. STAT. § 895.52 expansively." Id. Although the courts are to construe the statute liberally to give effect to the legislative purpose of granting immunity to property owners , our supreme court has noted that "we have likewise concluded that this immunity is not absolute." Id. , ¶ 50 (citing Roberts , 367 Wis.2d 386, ¶ 39, 879 N.W.2d 492, and Linville v. City of Janesville , 184 Wis.2d 705, 719, 516 N.W.2d 427 (1994) ).
¶ 19 "Generally, 'owners' under WIS. STAT. § 895.52 do not owe a duty of care to keep their properties safe for entry or recreational use." Id. , ¶ 23. Section 895.52(1)(d)1. defines "owner" as "[a] person, *534 including a governmental body or nonprofit organization, that owns, leases or occupies property."
¶ 20 In Westmas , our supreme court's most recent interpretation of the statute, the court addressed whether a contractor hired to cut tree limbs on the owner's property was shielded by the statute from liability when a limb being cut from a tree fell on a pedestrian and killed her. Id. , ¶ 13. The court focused on two questions to answer whether the contractor had been an "agent" of the owner for purposes of qualifying for recreational immunity. Id. , ¶ 37. First, it examined the level of control that the property owner "either exerted or had the right to exert" over the "task [performed by a third party] that caused the injury." Id. The court looked to prior cases for rules related to the principal's control of the "agent," id. , ¶ 32, and noted with approval the rule set forth in another context in which a party sought immunity: "absent 'reasonably precise specifications' established by the [principal], there could be neither control nor the right to control the conduct that caused the injury." Id. , ¶ 34 (citation omitted). Second, it "g[a]ve particular attention to whether the injury-causing conduct occurred when [the third party] was following [the property owner's] specific directions." Id. , ¶ 37. It noted that it sought to interpret and apply the statute "consistent with [the] purpose" the legislature had stated in adopting the statute. Id. , ¶ 49. It concluded that not extending immunity to the third-party contractor was consistent with that purpose because "it was [the landowner] that was responsible for opening the land to the public, not [the contractor]." Id. , ¶ 53. It then quoted from Roberts : "Granting immunity to third parties that are not responsible for opening up the land to the *535 public is unsupported by our prior case law." Id. (quoting Roberts , 367 Wis.2d 386, ¶ 41, 879 N.W.2d 492 ).
¶ 21 In applying the law to the facts, the Westmas court considered the fact that the property owner had "left the 'means and methods' " for conducting the work at issue to the contractor. Id. , 379 Wis.2d 471, ¶ 40, 907 N.W.2d 68.
¶ 22 In Roberts , our supreme court concluded[6] that a ballooning company offering *336 balloon rides at a charity event was not entitled to immunity under the statute because it was not the owner of the land and because "none of the prior cases interpreting [the statute] has granted immunity to a third party not responsible for opening up the land to the public." Id. , 367 Wis.2d 386, ¶ 33, 879 N.W.2d 492. The court stated that "immunizing [the ballooning company] would have no effect *536 on whether the public had access to private land, because [the ballooning company] is not responsible for opening the land to the public." Id. , ¶ 37. It further noted, "Extending immunity to [the third party] could lead to limitless immunity.... If [the company]-who has no connection to the land-is granted immunity, there will be no stopping point to recreational immunity." Id. , ¶ 39.
III. Fryed is not an "agent" for purposes of the recreational immunity statute.
¶ 23 Fryed argues that under the analysis employed in Westmas , it was at the relevant time "an agent of the Lions Club because the Lions Club retained the right to control the details of the injury-causing conduct."
¶ 24 Westmas examined whether the tree cutting company was an "agent" of the landowner. The court stated the test it applied as follows: it looked at the level of control that the property owner "either exerted or had the right to exert" over the "task that caused the injury[,]" giving "particular attention to whether the injury-causing conduct occurred when [the third party] was following [the property owner's] specific directions." Id. , 379 Wis.2d 471, ¶ 37, 907 N.W.2d 68.
¶ 25 Fryed argues that Miller, the person who did the walk-through for the Lions Club to check for safety hazards, "had the ability to direct the band where to run the cord" even though he "just did not exercise that right because he did not believe the ... cord posed a trip hazard." The fact that the Lions Club instructed bands to run their cords overhead the following year, he argues, is proof that it had the right to exert control over the task that caused the injury.
*537 While he focuses on the right to exert control, regardless of whether it was actually exerted, he does not address the court's statement that "absent reasonably precise specifications," there can be "neither control nor the right to control the conduct that cause[s] the injury." See id. , ¶ 34.
¶ 26 Fryed is also silent as to the application of the second focus specified by the Westmas court: that we are to give "particular attention to whether the injury-causing conduct occurred when [the third party] was following [the property owner's] specific directions ." Id. , ¶ 37 (emphasis added).
¶ 27 Applying that test here, it is apparent that Fryed was not following the Lions Club's "specific directions" when placing the cords, which is the injury-causing conduct in this case. Both Miller and Fry stated in their depositions that there were no instructions given by the Lions Club to those setting up the equipment for the bands at the festival. There is not any evidence in the record that would support a contrary conclusion. We are bound by *337 the framework set forth in Westmas , and it is dispositive of Fryed's agency theory.
IV. Fryed is not a statutory owner for purposes of the recreational immunity statute.
¶ 28 Fryed also argues that it is an "occupier" of the property within the meaning of WIS. STAT. § 895.52(1)(d)1. Like the Westmas court, we look to the decision in Roberts for guidance on applying the term "occupier" in this context. In that case, the plaintiff was injured "when one of the lines tethering a hot air balloon to the ground snapped, causing the basket of *538 the balloon to collide with [her], knocking her to the ground." Westmas , 379 Wis.2d 471, ¶ 45, 907 N.W.2d 68. The plaintiff had been attending a charity event sponsored by a nonprofit group and hosted on property owned by another nonprofit group. Id. Sundog Ballooning, LLC, was the owner and operator of the hot air balloon providing rides at the event. Id. On review, our supreme court in Westmas discussed the Roberts court's analysis of whether the ballooning company had "occupied" the property in question such that it was a statutory owner for purposes of applying the recreational immunity statute:
We began our discussion in Roberts by acknowledging that the definition of "occupy" in the context of recreational immunity is "to take and hold possession." In [Doane ], the court of appeals explained that the term "occupy" as it is used in WIS. STAT. § 895.52 requires "a degree of permanence, as opposed to the mere use of the property in question."
In Roberts , we also noted that the purpose of the recreational immunity statute is to encourage landowners to open land for public use. Defining Sundog as an occupier "would not further the policy which underlies the statute ... because the ... property was already open for public recreational purposes." This is so because regardless of whether Sundog was immune, the owner of the property, Beaver Dam Conservationists, was protected and would therefore not be discouraged from opening its land to the public.
See Westmas , 379 Wis.2d 471, ¶¶ 46-47, 907 N.W.2d 68 (citations omitted).
¶ 29 The Roberts court had explained its approach to the statute and the history of case law interpreting it: "None of the prior cases interpreting WIS. STAT. § 895.52 has granted immunity to a third *539 party not responsible for opening up the land to the public." Roberts , 367 Wis.2d 386, ¶ 33, 879 N.W.2d 492. "Granting immunity to third parties that are not responsible for opening up the land to the public is unsupported by our prior case law." Id. , ¶ 41. "In addition, it would create an absurd result with no logical stopping point that does nothing to further the legislative purpose of the statute." Id.
¶ 30 In this case, Fryed's presence on the property did not exceed "mere use" and did not approach "a degree of permanence." Fry's deposition testimony showed that he arrived at approximately 3:00 p.m. on the day in question to set up the equipment for the band's performance. He described putting the cords and equipment away at the end of the performance. Fryed's presence on the property did not constitute more than the ballooning company's presence on the property in Roberts or more than the tree-cutting contractor's presence on the property in Westmas .
¶ 31 Further, as was true in the facts presented in Westmas and Roberts , extending immunity to Fryed will not promote the policy of opening recreational land to the public. As the Westmas court noted, "denying immunity to [the contractor in that case] does not conflict with the *338 legislative history or purpose of [ WIS. STAT. ] § 895.52, nor does it contravene the legislature's mandate to interpret the statute broadly in favor of landowners. " Westmas , 379 Wis.2d 471, ¶ 53, 907 N.W.2d 68 (emphasis added).
¶ 32 For these reasons, we reverse the order granting summary judgment and remand for further proceedings.
By the Court. -Order reversed and cause remanded for further proceedings.
¶ 33 *540 I disagree with the Majority's conclusion that Fryed was not an "agent" under WIS. STAT. § 895.52, the recreational immunity statute, based on the circumstances of this case. After reviewing the record and relevant case law-particularly the Westmas case, upon which the Majority primarily relies for its conclusion-I believe that Fryed meets the requirements of an agent and is thus entitled to immunity. Therefore, I respectfully dissent.
¶ 34 In the first place, the Majority does not discuss the relationship between Fryed and the band, Rhythm Method, which was playing at the time of Lang's accident. Fryed is the sound engineer for the band and had set up the band's sound equipment, including the cord that Lang tripped over. Additionally, Fryed is a member of the band.
¶ 35 According to the record, the band had a contract with the Lions Club to play at the festival; Fryed did not have a separate contract with either the Lions Club or the band. Given these facts, Fryed's presence at the festival was directly related to his role as a member of the band, and the tasks he performed were linked to the band's contract with the Lions Club.
¶ 36 Fryed is the only remaining defendant in this case. The record indicates that the Lions Club was dismissed from this case because it was immune from liability under the recreational immunity statute. Although not specifically stated in the record before us, the band, which was also named as a defendant in this case, has also presumably been dismissed. It is reasonable to conclude that the band's dismissal was pursuant to the recreational immunity statute as well, based on its contract with the Lions Club. Thus, that immunity from liability should extend to Fryed because of his status as a member of the band.
*541 ¶ 37 Furthermore, an agency analysis of Fryed as an entity separate from the band, based on Westmas , leads to the same conclusion that Fryed is immune from liability.
¶ 38 As explained by the Majority, the issue of recreational immunity arose in Westmas when a tree branch, cut by a contractor trimming trees on private property, fell on a woman who was walking on a public path that crossed the property, causing her death. Id. , 379 Wis.2d 471, ¶ 1, 907 N.W.2d 68. In its decision, the Westmas court defined "agent" in the context of the recreational immunity statute as "one who acts on behalf of and is subject to reasonably precise control by the principal for the tasks the person performs within the scope of the agency." Id. , ¶ 36.
¶ 39 This definition encompasses the Westmas court's review of other decisions that involved agency determinations, including a government immunity case from which it garnered a requirement calling for "reasonably precise specifications." Id. , ¶ 34 (citation omitted). Specifically, the Westmas court cited that government immunity case for the premise that in the absence of " 'reasonably precise specifications' ... there could be neither control nor the right to control the conduct that caused the injury." See id. (citation omitted).
*339 ¶ 40 The Majority's narrow interpretation of this standard for establishing agency involves a two-pronged inquiry: (1) determining whether the property owner exerted or had the right to exert control over the proposed agent by virtue of providing reasonably precise specifications; and (2) determining "whether the injury-causing conduct occurred when [the third party] was following [the property owner's] specific directions." See Majority, ¶ 20.
*542 ¶ 41 Rather than the two-pronged inquiry advanced by the Majority, however, I believe the agency standard set forth in Westmas involves an encompassing analysis of the level of control the principal exerted or had the right to exert over the injury-causing conduct of the proposed agent, which includes a determination of whether there was "reasonably precise control" of the conduct as evidenced by "reasonably precise specifications" provided by the principal. See id. , 379 Wis.2d 471, ¶¶ 34, 36-37, 907 N.W.2d 68 (citation omitted). The determination of agency is a "fact-specific inquiry." See id. , ¶ 36. Therefore, in my view, the Westmas court's statement regarding its focus on "specific directions" provided by the property owner was not a separate inquiry, but rather a reflection of the fact set of that case. See id. , ¶ 37.
¶ 42 In its decision, the Westmas court paid particular attention to the fact that the property owner-the principal in that case-had provided the contractor with "[n]o means or methods" as to how to conduct the tree-trimming. Id. , ¶ 39. The court pointed out that the property owner had "no background or knowledge on how to perform tree-trimming," and thus "could not have controlled or had the right to control the methods" utilized by the contractor for the task, including any safety precautions. Id. , ¶ 42. Additionally, the property owner did not provide any tools, equipment or assistance to the contractor to complete the task. Id. , ¶ 40. In fact, the property owner was not even aware that the contractor was working at the property on the date of the accident. Id. In short, the property owner left all decisions as to the "means and methods" of performing the task, including safety precautions, to the contractor. Id. Therefore, the court concluded that the property owner "could not have *543 controlled or had the right to control the [contractor's] methods of work including safety specifications employed," and thus did not meet the requirements for agency. Id. , ¶ 42.
¶ 43 The facts in this case, however, are significantly different. Here, the Lions Club-the principal-was running the festival where the injury occurred. In fact, the record indicates that the Lions Club had substantial control over the area where the injury-causing task occurred. The Club determined where the tents and stages for the festival would be located. Additionally, members of the Lions Club set up the electrical service for the entire festival as well. This placement of the power sources determined how some of the cords required for the band's sound system were set up. Thus, "reasonably precise specifications" for the location of the cords is implicit in the Club's extensive involvement in the set up of the stage and power sources. See id. , ¶ 34.
¶ 44 Furthermore, members of the Lions Club did a "safety walkthrough" of the grounds prior to the start of the festival. During that walkthrough, the Club members looked for potential safety issues, such as making sure that "the electrical wiring [was] safe[.]" The Club owned "matting" to cover power cords to keep patrons of the festival from tripping, and took responsibility for placing that matting. The Majority does not address this *340 fact or provide any analysis as to why this fact is not indicative of the Lions Club having the right to exert, as well as actually exerting, "reasonably precise control" over the injury-causing conduct, that is, the unsafe placement of the cords. See id. , ¶ 36.
¶ 45 In sum, although the Lions Club did not tell Fryed precisely how to connect the cord that Lang tripped over, the Club set up the stage and the power *544 sources required by the band's sound system. This effectively provided reasonably precise specifications as to where the cords could be located. Furthermore, the Club was responsible for determining the safety of the cords, and had the obligation to cover any cords deemed to be a safety hazard. These facts demonstrate that the Club had the right to exert, and did in fact exert, reasonably precise control over the placement of, and the safety surrounding, the cord on which Lang tripped.
¶ 46 For these reasons, Fryed has met the requirements of an agent, and is thus entitled to immunity under the recreational immunity statute. I would therefore affirm the trial court's grant of summary judgment in favor of Fryed.

Under Wis. Stat. § 895.52(2)(b), where the public is given access to property for recreational use, "no owner and no officer, employee or agent of an owner is liable" for injury incurred on the owner's property.
All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The statute defines "owner" as "[a] person ... that owns, leases or occupies property." Wis. Stat. § 895.52(1)(d)1.See also Hall v. Turtle Lake Lions Club , 146 Wis.2d 486, 491, 431 N.W.2d 696 (Ct. App. 1988) (holding that for purposes of interpreting § 895.52, "owner" also means "one who has the actual use of property without legal title, dominion or tenancy").

See Held v. Ackerville Snowmobile Club, Inc. , 2007 WI App 43, ¶ 9, 300 Wis.2d 498, 730 N.W.2d 428 ("One circumstance that may affect immunity is whether a property owner's allegedly negligent act is related to the condition or maintenance of the land.").

Lang v. Lions Club of Cudahy Wis., Inc. , No. 2015AP2354, 373 Wis.2d 309, 2016 WL 7471552, unpublished slip op. ¶ 2 (WI App Dec. 28, 2016) (footnote omitted).

It is not disputed that Lang was engaging in a recreational activity within the meaning of Wis. Stat. § 895.52(1)(g). On appeal, it is not disputed that the Lions Club, a nonprofit organization, properly was granted summary judgment as an "owner" under § 895.52(1)(d)1.

The Roberts decision is a 4-3 decision. The opinion of the court is supported by the votes of four justices, one of whom noted, in a separate writing not joined by any other justice, that she "join[ed] the opinion of the court." Roberts v. T.H.E. Ins. Co. , 2016 WI 20, ¶ 66, 367 Wis.2d 386, 879 N.W.2d 492. The concurring justice wrote separately because she wished to address a separate issue that the court "appropriately does not reach" in the majority opinion. Id. , ¶¶ 66-67. The concurrence refers to the "opinion of the court" and does not include language disavowing the rationale. In two separate writings, dissenting justices repeatedly refer to the opinion of the court as "the majority." Id. , ¶¶ 107, 115, 139, 140, 143. In the court's subsequent 5-2 decision in Westmas , the court's majority treats Roberts as precedential, referring to it as the court's decision ("As we stated in Roberts ...."). See Westmas v. Creekside Tree Serv., Inc. , 2018 WI 12, ¶ 53, 379 Wis.2d 471, 907 N.W.2d 68. We are therefore surprised by Fryed's vigorous argument in briefs and at oral argument that Roberts is a mere plurality decision and that this court is not bound by its holding. No justice, including the Roberts dissenter who authored the Westmas decision, considered Roberts anything but a majority opinion of the court.