# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2017AP2510 |

| | |
|---|---|
| COMPLETE TITLE: | Antoinette Lang and Jim Lang,<br>          Plaintiffs-Appellants,<br>Wisconsin State Department of Health & Human Services,<br>          Involuntary-Plaintiff,<br>     v.<br>Lions Club of Cudahy Wisconsin, Inc., Ace American Insurance Company, Rhythm Method, LLC and Administrator of Health Care Financing Administration,<br>          Defendants,<br>State Farm Fire & Casualty Company,<br>          Defendant-Respondent,<br>Fryed Audio, LLC,<br>          Defendant-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 384 Wis. 2d 520,920 N.W.2d 329
PDC No:2018 WI App 69 - Published

| | |
|---|---|
| OPINION FILED: | March 5, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 4, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | William Sosnay |

JUSTICES:

ROGGENSACK, C.J., announced the mandate of the Court, and delivered an opinion, in which ZIEGLER, J., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined. HAGEDORN, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Neal C. Schellinger* and *Schellinger & Associates, LLC*, Waukesha. There was an oral argument by *Neal C. Schellinger*.

For the plaintiffs-appellants, there was a brief filed by *Anthony J. Skemp* and *Martin Law Office, S.C.,* Oak Creek. There was an oral argument by *Anthony J. Skemp*.

An amicus curiae brief was filed on behalf of Wisconsin Association for Justice by *William C. Gleisner, III*, Brookfield.

An amicus curiae brief was filed on behalf of Wisconsin Defense Counsel by *Brian D. Anderson* and *Everson, Whitney, Everson & Brehm, S.C.*, Green Bay; *Monte Weiss* and *Weiss Law Office,* Mequon; and *Timothy Johnson* and *Crivello Carlson*, Eau Claire.

No. 2017AP2510
(L.C. No. 2014CV3866

STATE OF WISCONSIN      :      IN SUPREME COURT

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

**Antoinette Lang and Jim Lang,**

        **Plaintiffs-Appellants,**

**Wisconsin State Dept. of Health & Human Services,**

        **Involuntary-Plaintiff,**

     **v.**

**Lions Club of Cudahy Wisconsin, Inc., Ace American Insurance Company, Rhythm Method, LLC and Administrator of Health Care Financing Administration,**

        **Defendants,**

**State Farm Fire & Casualty Company,**

        **Defendant-Respondent,**

**Fryed Audio, LLC,**

        **Defendant-Respondent-Petitioner.**

**FILED**

**MAR 5, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, C.J., announced the mandate of the Court, and delivered an opinion, in which ZIEGLER, J., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined. HAGEDORN, J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a decision of the court of appeals[1] reversing an order of the circuit court[2] that granted summary judgment in favor of Fryed Audio, LLC on the ground that it was entitled to recreational immunity pursuant to Wis. Stat. § 895.52(2) (2017-18).[3] Fryed Audio is a member of Rhythm Method, LLC, with whom the Lions Club of Cudahy Wisconsin, Inc. contracted to provide music for its 2012 festival at a Milwaukee County park. The sole member of Fryed Audio, Steven Fry, laid Rhythm Method's electronic and electric cords on the floor of the music tent for the Lions Club event. Antoinette Lang allegedly tripped on a cord, which led to this lawsuit.

¶2 Because the Lions Club is a statutory owner pursuant to Wis. Stat. § 895.52(1)(d)1., Fryed Audio moved for summary judgment citing § 895.52(2), which provides that agents of owners have immunity from claims by those who enter land of a statutory owner to engage in recreational activity. The circuit court concluded that Fryed Audio was an agent of the Lions Club and therefore entitled to recreational immunity. The court of appeals reversed, reasoning that the Lions Club lacked the right to control Fryed Audio.

---

[1] Lang v. Lions Club of Cudahy Wis., Inc., 2018 WI App 69, 384 Wis. 2d 520, 920 N.W.2d 329 (2018).

[2] The Honorable William Sosnay of Milwaukee County presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

¶3    We conclude that there are no issues of material fact in regard to the Lions Club's right to control Fryed Audio in regard to laying the cords for Rhythm Method's amplified sound and that Fryed Audio was an agent of the Lions Club who lawfully acted through its subagent, Steven Fry.  Because the Lions Club was a statutory owner, Fryed Audio, as its agent, is entitled immunity pursuant to Wis. Stat. § 895.52(2).  Accordingly, we reverse the court of appeals.

## I.  BACKGROUND

¶4    The Lions Club is a nonprofit entity.  Annually, it has organized a fundraising event called the Sweet Applewood Festival. The Festival has been a Lions Club event for fourteen years.

¶5    The Festival has operated similarly year-to-year and has involved many of the same participants.  The event has used the same park, located in Milwaukee County.  The tents, including the music tent, have been in approximately the same location. Furthermore, the inside of the music tent has been set up similarly.  As a co-chair of the 2012 event, Frank Miller, a Lions Club member, testified:  "We've used the same location for several years, so siting of the tents and other equipment is pretty straightforward.  Everyone just knows where things go."

¶6    The Lions Club has controlled the grounds and determined how the Festival has run.  Among other things, it controls how and where tents are placed; the selection of vendors; and ensures necessary services such as security, first responders, and garbage disposal are provided.

¶7 The Lions Club decided where the band was located and it set up the stage. Furthermore, the Lions Club was responsible for general electrical work. To quote Miller's deposition:

> The Lions Club has an electrical service that is run into the park with our own breakers and disconnects. We run wiring out of that service to both tents to supply power for lighting, food, and for the bands to connect to.

¶8 In 2012, Miller applied for a special event permit on behalf of the Lions Club. The event description stated, "COMMUNITY FESTIVAL FEATURING FOOD, BEVERAGES, MUSIC, CARNIVAL RIDES, RAFFLES. FESTIVAL IS RUN AS THE MAJOR ANNUAL FUNDRAISER FOR THE CUDAHY LIONS CLUB."

¶9 The application noted that the event would include "amplified sound," and the instructions on the application explained that the Lions Club would need to provide a copy of a Noise Variance Permit. Furthermore, the instructions stated:

> Amplified sound must be directed away from residences. Amplified sound must comply with Section 47.022, Noise, of Chapter 47 of the Milwaukee County Ordinances. It is the responsibility of the Event Organizer to provide electrical requirements to support the event.

¶10 The Lions Club contracted with Rhythm Method for music. The contract stated that "sound and lights" would be provided by Rhythm Method. It also stated, "[p]rofessional covered stage and power by purchaser." Additionally, the contract provided that each member of Rhythm Method was individually obligated to adhere to its terms and conditions and that the leader of Rhythm Method was an agent of the Lions Club:

4

> The Performer(s) are engaged <u>severally</u> on the terms and conditions of this agreement. The leader represents that the Performer(s) already designated have agreed to be bound by said terms and conditions. Each performer, not yet chosen, shall also be bound by said terms and conditions upon acceptance.
>
> . . . .
>
> The leader shall, as the <u>agent</u> of the Purchaser, enforce disciplinary measures for just cause and carry out instructions as to selections and manner of performance.

(Emphasis added.)

¶11 Rhythm Method, LLC had five people as members plus Fryed Audio, another LLC. Steven Fry was the sole member of Fryed Audio. The contract with the Lions Club was signed, "Steven Fry," on behalf of Rhythm Method, LLC.

¶12 Mrs. Lang allegedly tripped on a cord run by Steven Fry between a sound board and the stage. She and her husband sued several parties for negligence. At this point, the only defendant remaining is Fryed Audio.

¶13 During a deposition, Steven Fry explained that he had not received specific instructions from the Lions Club on how to lay electric and electronic cords. Miller said he had not provided "any prohibitions, or specific instructions, or directives as to how [those who set up the bands' equipment] [a]re supposed to run their wires from that sound board in the middle of the tent to the stage at that time which they're performing." However, the Lions Club had the right to control how the electronic and electric cords were placed, as is apparent in the terms of the contract and from

5

the control the Lions Club exercised in Festivals subsequent to 2012.[4]

¶14 In years past, before a Festival began, a Lions Club official performed a walkthrough looking for, among other things, trip hazards. Miller testified he did not specifically recall performing a walkthrough in 2012; however, he testified that it had been his practice each year. His deposition provided a detailed description of the typical walkthrough:

> I'm looking for issues with the pavement. The festival is held on a basketball court that needs to be resurfaced. I'm looking for any obvious holes or problems with the pavement, making sure we have the cooking areas where we have grills and fr[y]ers, making sure that area is fenced off so the public can't wander through there. We have electrical service to feed lighting and music in the tents that we're responsible for and make sure that that wiring, the electrical

---

[4] In subsequent years, the Lions Club asserted more control over Rhythm Method, requiring that their electronic and electric cords be suspended from the ceiling. Fryed Audio cites this control to contend that it was subject to the Lions Club's control in 2012. Generally, courts hesitate to rely on subsequent remedial measures. Wisconsin Stat. § 904.07 provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment or proving a violation of s. 101.11.

In this particular case, Fryed Audio sought to use evidence of subsequent remedial measures as evidence of "control," a permissible use under § 904.07.

6

wiring, is safe, and the electrical cabinets are secured and the public can't get access to those cabinets.

¶15 Steven Fry explained that a band's sound engineer and setting up a band's sound equipment were two different functions:

> [A] sound engineer is the guy who sits and turns knobs and everything else. You can be an engineer and not touch a piece of gear. . . . I can walk in and be an engineer and it's not my stuff.

Q   So you can walk into a gig that provides the equipment and you would still be considered an engineer?

A   Yes sir.

¶16 Notably, Rhythm Method had a prior relationship with the Lions Club. It had played at the festival in past years, including 2011. In the past, when the Lions Club determined that cords needed to be covered, it provided the mats to do that. It also placed orange cones to alert frequenters to a potential hazard.

¶17 The circuit court concluded that Fryed Audio was an agent of the Lions Club; however, the court of appeals reversed the circuit court because it concluded that the absence of reasonably precise specifications regarding the placement of cords negated the possibility of an agency relationship. Lang v. Lions Club of Cudahy Wis., Inc., 2018 WI App 69, ¶4, 384 Wis. 2d 520, 920 N.W.2d 329 (2018). We granted Fryed Audio's petition for review and now reverse.

## II. DISCUSSION

### A. Standard of Review

¶18 "We review a grant or denial of summary judgment independently, applying the same standards employed by the circuit

7

court and court of appeals, while benefitting from their discussions." Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶16, 379 Wis. 2d 471, 907 N.W.2d 68 (citing Dufour v. Progressive Classic Ins. Co., 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678). "Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party has established his or her right to judgment as a matter of law." Westmas, 379 Wis. 2d 471, ¶16 (citing Wis. Stat. § 802.08(2) (2013-14); Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶10, 342 Wis. 2d 311, 818 N.W.2d 819). Here, the material facts are not in dispute. The outcome turns on statutory interpretation and application and whether the undisputed facts establish an agency relationship.

¶19 "Statutory interpretation and application are questions of law that we review independently." Westmas, 379 Wis. 2d 471, ¶17 (citing Highland Manor Assoc. v. Bast, 2003 WI 152, ¶8, 268 Wis. 2d 1, 672 N.W.2d 709). Notably, the statute at issue provides immunity to an "agent of an owner."

¶20 At times, the existence of an agency relationship is a question of fact because the determination turns on "the understanding between the alleged principal and agent." Soczka v. Rechner, 73 Wis. 2d 157, 163, 242 N.W.2d 910 (1976) (citing Bigley v. Brandau, 57 Wis. 2d 198, 203 N.W.2d 735 (1973)). However, whether undisputed facts establish an agency relationship therefore entitling the agent to recreational immunity under Wis. Stat. § 895.52(2) is a question of law that we review

8

independently. Westmas, 379 Wis. 2d 471, ¶17 (citing Highland Manor Ass'n, 268 Wis. 2d 1, ¶8).

### B. Statutory Interpretation

#### 1. General Principles

¶21 "The purpose of statutory interpretation is to determine what the statute means so that it may be properly applied." Westmas, 379 Wis. 2d 471, ¶18 (citing State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110). We look first to the language of the statute. Westmas, 379 Wis. 2d 471, ¶18 (citing Kalal, 271 Wis. 2d 633, ¶45). "If the words chosen for the statute exhibit a 'plain, clear statutory meaning,' without ambiguity, the statute is applied according to the plain meaning of the statutory terms." Westmas, 379 Wis. 2d 471, ¶18 (quoting State v. Grunke, 2008 WI 82, ¶22, 311 Wis. 2d 439, 752 N.W.2d 769). In determining the plain meaning of a statute, a court should consider the context of the language. Westmas, 379 Wis. 2d 471, ¶19 (quoting Kalal, 271 Wis. 2d 633, ¶46). A statute's purpose, as expressed in its text, can inform its plain meaning. Westmas, 379 Wis. 2d 471, ¶19 (citing Kalal, 271 Wis. 2d 633, ¶48). Additionally, "legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation." Kalal, 271 Wis. 2d 633, ¶51 (citing Seider v. O'Connell, 2000 WI 76, ¶¶51–52, 236 Wis. 2d 211, 612 N.W.2d 659).

#### 2. Wisconsin Stat. § 895.52

¶22 Wisconsin Stat. § 895.52(2) states:

> [N]o owner and no officer, employee or agent of an owner owes to any person who enters the owner's property to engage in a recreational activity:
>
> 1. A duty to keep the property safe for recreational activities.
>
> 2. A duty to inspect the property, except as provided under s. 23.115(2).
>
> 3. A duty to give warning of an unsafe condition, use or activity on the property.

The statute provides a broad definition of both "owner" and "recreational activity." An owner can be a "nonprofit organization, that owns, leases or occupies property." § 895.52(1)(d)1. Recreational activity means:

> any outdoor activity undertaken for the purpose of exercise, relaxation or pleasure, including practice or instruction in any such activity. "Recreational activity" includes hunting, fishing, trapping, camping, picnicking, exploring caves, nature study, bicycling, horseback riding, bird-watching, motorcycling, operating an all-terrain vehicle or utility terrain vehicle, operating a vehicle, as defined in s. 340.01 (74), on a road designated under s. 23.115, recreational aviation, ballooning, hang gliding, hiking, tobogganing, sledding, sleigh riding, snowmobiling, skiing, skating, water sports, sight-seeing, rock-climbing, cutting or removing wood, climbing observation towers, animal training, harvesting the products of nature, participating in an agricultural tourism activity, sport shooting and any other outdoor sport, game or educational activity. "Recreational activity" does not include any organized team sport activity sponsored by the owner of the property on which the activity takes place.

§ 895.52(1)(g).

¶23 "In 1983, the Wisconsin legislature enacted Wis. Stat. § 895.52, which dramatically expanded liability protection for landowners who open their private property for public recreational

use." Westmas, 379 Wis. 2d 471, ¶21. The legislation included a purpose statement:

> The legislature intends by this act to limit the liability of property owners toward others who use their property for recreational activities under circumstances in which the owner does not derive more than a minimal pecuniary benefit.

1983 Wis. Act 418, § 1. "As our cases have explained, 'the impetus for this law is the continual shrinkage of the public's access to recreational land in the ever more populated modern world.'" Westmas, 379 Wis. 2d 471, ¶22 (quoting Roberts v. T.H.E. Ins. Co., 2016 WI 20, ¶28, 367 Wis. 2d 386, 879 N.W.2d 492). In keeping with the goal of the legislature to protect property owners, courts have interpreted the statute broadly in their favor. Westmas, 379 Wis. 2d 471, ¶22.

¶24 The parties do not dispute that the Lions Club was an owner under the statutory definition, nor do they dispute that the festival was a recreational activity in which Mrs. Lang was participating when she fell. Their dispute centers on whether Fryed Audio was an "agent of an owner," i.e., an agent of the Lions Club.

### a. Agency

¶25 People and businesses sometimes act through others. As a general principle, a person or business acting on behalf of another, and subject to control of another, is an agent and the person or business they are acting on behalf of, a principal. Agency law provides a series of rules that apply to such relationships. Among these rules are provisions that govern when

11

a principal is liable for the actions of its agent. Ronald C. Wyse, A Framework of Analysis for the Law of Agency, 40 Mont. L. Rev. 31, 32 (1979) ("Agency analysis . . . is not concerned with whether there is any liability, but to whom the liability runs."). "The foundational principle of agency law is that the principal, who has chosen to conduct her business through an agent, must bear the foreseeable consequences created by that choice." Paula J. Dalley, A Theory of Agency Law, 72 U. Pitt. L. Rev. 495, 497 (2011). This principle arises from the benefit that the principal derives from acting through the agent whom the principal controls. Id.

¶26 Wisconsin Stat. § 895.52 does not define agent. Westmas, 379 Wis. 2d 471, ¶26. Furthermore, we have had few occasions to address the concept of agency within the confines of recreational immunity. When we have, however, we have given the word "agent" its plain meaning as a legal concept. Westmas, 379 Wis. 2d 471, ¶¶30-33. Our conclusion that agent should be given its meaning in the law is supported by the legislature's directive:

> In the construction of Wisconsin laws the words and phrases which follow shall be construed as indicated unless such construction would produce a result inconsistent with the manifest intent of the legislature:
>
> (1) GENERAL RULE. All words and phrases shall be construed according to common and approved usage; but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning.

Wis. Stat. § 990.01.

12

¶27 Furthermore, the drafting file of 1983 Wisconsin Act 418, which created the recreational immunity statute, includes a letter that confirms that agent, as that term is employed in Wis. Stat. § 895.52, has a particular meaning in the law. The letter discusses § 895.52(5), which states that a nonprofit organization may be liable, despite the immunity provided by § 895.52(2), for the "malicious acts" of its agents. The letter explains:

> The intent is that a nonprofit organization is to be liable only for its malicious acts. It would be liable for the malicious acts of its agents only when they can be attributed to it by the regular law of agency. The agents of a nonprofit organization are liable only for their own malicious acts.

Letter to Ruth Reinl, Office of Senator David Helbach, from John R. Zillmer, Attorney, at 3 (Oct. 11, 1983) (Drafting File, 1983 Wis. Act 418) (on file with the David T. Prosser, Jr. State Law Library). The reference to "the regular law of agency" confirms that it was expected that agent would be given its meaning in the law.

¶28 We have cited the Restatement Second's definition of agency with approval: "'[A]gency' [is] 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Westmas, 379 Wis. 2d 471, ¶30 (quoting Restatement (Second) of Agency § 1(1) (1958)).

¶29 We have concluded that an agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and

13

consent by the other so to act." Hoeft v. Friedel, 70 Wis. 2d 1022, 1034, 235 N.W.2d 918 (1975); see also, Wyse, supra, at 38 (explaining an "assent, benefit, and control test"). An agent may be either an employee or an independent contractor; however, when "an independent contractor has no fiduciary obligations to and is not subject to control by the principal, no agency relationship has formed." Westmas, 379 Wis. 2d 471, ¶31 (quoting Romero v. West Bend Mut. Ins. Co., 2016 WI App 59, ¶40, 371 Wis. 2d 478, 885 N.W.2d 591). In the present dispute, the parties do not contest that the Lions Club assented to Rhythm Method acting on its behalf or the benefit of Rhythm Method's music for the Lions Club's festival. Instead, they focus on whether the Lions Club had the right to control Fryed Audio, a member of the independent contractor, Rhythm Method.

¶30 The principal's right to control the injury causing conduct is crucial to both the existence of an agency relationship and the scope of the agency. It does not matter whether the conduct that caused the injury is complex or simple. What matters in forming an agency relationship is that the principal has the right to control that conduct. Hoeft, 70 Wis. 2d at 1034. A principal is liable for the conduct of an agent when the injury causing conduct is "of the same general nature as authorized, or incidental to the conduct authorized." Restatement (Second) of Agency § 229(1). Stated otherwise, the principal is liable only if the principal had the "right to control" the injury causing conduct. Westmas, 379 Wis. 2d 471, ¶42. A principal does not have to exercise that right; however, without the right to control

14

the injury causing conduct, an agency cannot exist relative to that conduct. Id., ¶38.

¶31 In Westmas, we interpreted the word agent within the context of recreational immunity. There, a property owner contracted with a tree-trimming service. Id., ¶39. The contract provided "[n]o means or methods" controlling how the trees were to be trimmed or whether safety precautions were to be employed. Id. We emphasized that the property owner had "no background or knowledge on how to perform tree-trimming." Id., ¶42. Furthermore, the property owner did not know that the tree-trimming service was working at the time its conduct caused an injury. Id., ¶40. We quoted the court of appeals, which stated:

> From the decision regarding whether or not to use a rope to bring down the branch that killed [the plaintiff], to where safety cones would be placed, to how "spotters" would be utilized, the record is clear that [the tree-trimming service, not the property owner] maintained control over the details of its work, particularly the actions that led to [the plaintiff's] death.

Id., ¶41.

¶32 In concluding that an agency relationship did not exist, we noted the lack of "reasonably precise specifications" for tasks that required knowledge about trimming trees and in regard to safety precautions that were needed for tree trimming. Id., ¶¶34, 42, 43. The tree-trimming service argued that an emphasis on the lack of reasonably precise specifications would "deny agency status, and therefore immunity, to all independent contractors of a landowner who lacks employees with the expertise to control and supervise the details of the contractor's work." Id., ¶43. We

15

rejected this argument, noting it was unpersuasive because the question of agency is "fact-specific" and "fact-bound." Id., ¶¶36, 43. To summarize, in Westmas the property owner merely had the right to expect a result as opposed to the right to control the injury causing conduct, i.e., the means by which tree-trimming was accomplished. 2A C.J.S. Agency § 18 (2019). Therefore, although there was a contract between the tree trimmer and the property owner, no agency relationship existed because the property owner did not have the right to control the tree trimmer's conduct that caused the injury.

¶33 In the present case, the court of appeals split because of a difference of opinion regarding the proper reading of Westmas. The majority quoted Westmas for the assertion that "'absent reasonably precise specifications,' there can be 'neither control nor the right to control the conduct that cause[s] the injury.'" Lang, 384 Wis. 2d 520, ¶25 (quoting Westmas, 379 Wis. 2d 471, ¶34). The dissent responded:

> I believe the agency standard set forth in Westmas involves an encompassing analysis of the level of control the principal exerted or had the right to exert over the injury-causing conduct of the proposed agent, which includes a determination of whether there was "reasonable precise control" of the conduct as evidenced by "reasonably precise specifications" provided by the principal. The determination of agency is a "fact-specific" inquiry. Therefore, in my view, the Westmas court's statement regarding its focus on "specific directions" provided by the property owner was not a separate inquiry, but rather a reflection of the fact set of that case.

Lang, 384 Wis. 2d 520, ¶41 (Brash, J., dissenting) (internal citations omitted).

16

¶34 We agree with Judge Brash's reading of Westmas. Westmas emphasized that its inquiry was fact-specific, and its conclusion rested on several facts: (1) the written agreement did not contemplate control of the methods used to trim trees or safety precautions required of the tree trimmers who had caused the injury; rather, the contract provided a "vision and concept" and the property owner did not supplement the writing with more specific instructions, Westmas, 379 Wis. 2d 471, ¶42; (2) the property owner had "no background or knowledge on how to perform tree-trimming," id.; and (3) the property owner was not aware that the tree-trimming service was working on the day the injury occurred, id., ¶40. Together, these facts demonstrated that the property owner hired the tree-trimming service to achieve a result but did not have the right to control the injury causing conduct. Stated otherwise, the property owner did not have the right to control the process used to remove the tree limb that caused the injury at issue.

¶35 The right to control the conduct that caused the injury is critical to evaluating whether an agency exists, and if so, the scope of the agency. However, whether the injury-causing task is simple or requires some degree of specific knowledge by the contracting party affects the weight we give to the absence or presence of "reasonably precise specifications." For example, in Geise v. Montgomery Ward, Inc., 111 Wis. 2d 392, 331 N.W.2d 585 (1983), a father told his son to cut the lawn, and the son negligently injured a minor child while doing as his father asked. We concluded:

17

> [The son] was acting as [his father's] servant at the time of the accident. This finding does not rest on the domestic relationship between [father and son], or the fact that the activity can be labeled a "domestic chore." The finding of a master-servant relationship rests on the fact that [the father] directed [his son] to perform the task, he had the right to control [his son's] performance of the task and, [the father] . . . benefited from its performance.

Id. at 416–17. We did not discuss or emphasize the precision, or lack of precision, in the father's directions to his son. Doing so would have made little sense given the simple nature of the task. Instead, our emphasis was the father's right to control his son's actions, actions that resulted in injury.

¶36 Fryed Audio's placement of electronic and electric cords was a simple task that Fryed Audio had performed at the Lyons Club's festivals in year's past, including the 2011 Festival. However, both the written contract and the testimony of Miller showed that the Lions Club had a right to control how the cords were placed and whether mats were used to cover them.

¶37 The contract specified that Rhythm Methods and its individual members, which included Fryed Audio, were "bound by the terms and conditions" of the contract, thereby subjecting them to the Lions Club's control.

> The Performer(s) are engaged severally on the terms and conditions of this agreement. The leader represents that the Performer(s) already designated have agreed to be bound by said terms and conditions. Each performer, not yet chosen, shall also be bound by said terms and conditions upon acceptance.

The contract, which bore the signature, "Steven Fry," on behalf of Rhythm Method, also specified that the leader of Rhythm Methods was "the agent" of the Lions Club:

18

> The leader shall, as the agent of the Purchaser, enforce disciplinary measures for just cause and carry out instructions as to selections and manner of performance.

Here, Fryed Audio was the leader of Rhythm Method for purposes of setting up the sound system, and its sole member, Steven Fry, was the leader in regard to contracting on behalf of Rhythm Method. As an agent of the Lions Club, Fryed Audio was subject to the Lions Club's right to control the injury causing conduct. Westmas, 379 Wis. 2d 471, ¶¶38, 42.

¶38 The testimony of Miller demonstrated the control that the Lions Club had on placing of cords needed for the amplified sound of Rhythm Method. He said that, since Mrs. Lang's fall in 2012 the Lions Club "require[s] sound companies to either cover their wiring or run it over head from the soundboards to the stages." Miller also testified as follows:

Q    What, if anything do you do to protect your patrons from tripping on these cords?

A    We have matting on the cords and orange cones.

Q    From whom do you get the matting?

A    We own the matting.

Q    When you say we, do you mean the Cudahy Lions Club?

A    The Cudahy Lions Club owns the matting.

Q    And the Cudahy Lions Club is specifically responsible for putting the matting on the exposed wires?

A    Yes.

By contract, Fryed Audio, was individually bound to the contract's terms. As the leader of Rhythm Method in placing the electronic and electric cords, Fryed Audio was the "agent" of the Lions Club,

thereby giving the Lions Club the right to control the conduct that is alleged to have caused injury. Miller's testimony further explained the relationship between Rhythm Method and the Lions Club that gave the Lions Club the right to control the injury causing conduct, i.e., the placing and covering cords that were used to provide amplified sound. Fryed Audio was the agent of the Lions Club, because the Lions Club had the right to control Fryed Audio in many respects, including the placing of electronic and electrical cords for the amplified sound of Rhythm Method.

### b. Subagency

¶39 Sometimes, an agent hires people or businesses to perform tasks on behalf of its principal. The hired people or businesses are known as subagents. 3 Am. Jur. 2d Agency § 7 (2019) ("A subagent is a person employed by the agent to assist him or her in conducting the principal's affairs."). As the Restatement (Third) of Agency illustrates:

> P Corporation retains A Corporation to manage its investment portfolio. S, a senior vice-president of A Corporation, is placed in charge of the management of P Corporation's portfolio. S is P Corporation's subagent.

Restatement (Third) of Agency § 3.15 cmt. b, Ill. 2.

¶40 Furthermore, the Restatement (Third) of Agency provides:

> (1) A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to principal. The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency. . . .

(2) An agent may appoint a subagent only if the agent has actual or apparent authority to do so.

Id., § 3.15; see also Booker v. United American Ins. Co., 700 So. 2d 1333, 1335 (Ala. 1997) (quoting 3 C.J.S. Agency § 265 (1973)) ("When one employs an agent who has either express or implied authority to employ a subagent, the subagent will also be the agent of the principal.").[5]

---

[5] Though some of the most concise statements about subagency are found in the Restatement (Third) of Agency, the concept is decades old. See, e.g., Estes v. Crosby, 171 Wis. 73, 79, 175 N.W. 933 (1920) (discussing subagency in the context of a real estate sale).

Indeed, one article, reprinted in the Reporter's Notes of the Restatement (Second) of Agency, explains:

A principal as such is not, without special agreement, liable to a subagent for compensation. That the subagent is nevertheless his agent now seems clear beyond doubt. . . . [F]or many years the courts have been practically unanimous, whatever their dicta may say, in making the principal responsible for the subagent's conduct in all the ways in which the conduct of a nonservant agent may make a principal liable. Thus the courts now consistently hold that the principal is bound by the knowledge of the subagent as if he had been directly appointed, with only an occasional dictum to the contrary. . . .

[I]f at any time the subagent is in fact under the control of the principal, his conduct in obedience to the principal's directions would make him a servant for whose conduct the principal, now a master, would be responsible.

Restatement (Second) of Agency § 5, Reporter's Notes (Appendix vol. 3) (reprinting Warren A. Seavey, Subagents and Subservants, 68 Harv. L. Rev. 658, 665-66 (1955)).

The substance of the Restatement (Third) of Agency is similar to the Restatement (Second) of Agency. Restatement (Third) of Agency §3.15, Reporter's Notes at a.

¶41  A subagent owes duties to both the principal and the appointing agent.  2A C.J.S. Agency § 263 (2019) ("[A] subagent who knows of the existence of the ultimate principal owes the principal the same duties owed by the agent.").  In particular, "[a] subagent owes a duty of obedience to the principal as well as to the appointing agent."  Restatement (Third) of Agency § 3.15 cmt. d.  However, "the principal's rights as to the subagent are superior to rights of the appointing agent, even in the event of conflict or disagreement between principal and appointing agent." Id.

¶42  "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent."  Id. cmt. c.  "The agent's authority to appoint a subagent may be inferred from those powers, customs, and usages positively established, but if the agent has no authority, express or implied, to make the person so appointed the agent of the principal, that person is simply the agent of the agent and not the principal."  3 Am. Jur. 2d Agency § 7; see also McKinnon v. Vollmar, 75 Wis. 82, 89, 43 N.W. 800 (1889) (concluding that an agent is assumed to have authority to appoint a subagent to perform tasks that are "purely executive or ministerial, and the principal is bound by the acts of such subagent.").

¶43  "When an agent is itself a corporation or other legal person, its officers, employees, partners, or members who are designated to work on the principal's account are subagents." Restatement (Third) of Agency § 3.15 cmt. b.  Stated otherwise,

22

when a principal creates an agency relationship with a legal person, such as an LLC, the principal implicitly consents to someone other than the agent performing the work, i.e., a person that exists only as a matter of law must act through others. An LLC may act through its members, at least if it is member managed. Wis. Stat. § 183.0301(1)(a) ("Each member is an agent of the limited liability company, but not of the other members or any of them, for the purpose of its business."). Therefore, a contract that creates an agency relationship with an LLC necessarily implies an agency relationship with at least some of its members, officers, employees, or other agents.

¶44 When a subagent is an agent of the principal, a principal is liable for the tortious actions of a subagent. To explain:

> As between a principal and third parties, it is immaterial that an action was taken by a subagent as opposed to an agent directly appointed by the principal. In this respect, subagency is governed by a principle of transparency that looks from the subagent to the principal and through the appointing agent. As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent.

Hartford Fire Ins. Co. v. Clark, 727 F. Supp. 2d 765, 774 (D. Minn. 2010) (quoting Restatement (Third) of Agency § 3.15 cmt. d (2006)). Stated otherwise, "[o]nce a third party is validly appointed a subagent, the principal is liable for the subagent's actions." 3 Am. Jur. 2d Agency § 7.

### 3. Application

¶45 In the case-at-hand, Steven Fry laid the cables on which Mrs. Lang is alleged to have tripped. He is the sole member of

23

Fryed Audio, and Fryed Audio is a member of Rhythm Method, the band that the Lions Club contracted with to perform at the 2012 festival. Fryed Audio, through the actions of Steven Fry, connected the sound system that Rhythm Method needed to fulfill its contract with the Lions Club.

¶46 Fryed Audio had no other contract with the Lions Club because as a member of Rhythm Method, Fryed Audio was individually a party in the contract between the Lions Club and Rhythm Method. This is so because the written contract anticipated a contractual relationship with each individual member of Rhythm Method. It provided:

> The Performer(s) are engaged <u>severally</u> on the terms and conditions of this agreement. The leader represents that the Performer(s) already designated have agreed to be bound by said terms and conditions. Each performer, not yet chosen, shall also be bound by said terms and conditions upon acceptance.

(Emphasis added.)

¶47 The terms and conditions of the contract also provided that:

> The Performer(s) shall do everything necessary to prosecute the work in an expeditious and workman-like manner pursuant to the standards of the trade and all work performed will be in accordance with generally accepted trade practices. The Performer(s) shall perform said work at the time and place herein specified and will be punctual and will provide his own equipment for said work unless otherwise specified herein.
>
> . . . .
>
> The leader shall, as the <u>agent</u> of the Purchaser, enforce disciplinary measures for just cause and carry out instructions as to selections and manner of performance.

24

(Emphasis added.)

¶48 As we have explained above, an agency relationship is driven by "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Westmas, 379 Wis. 2d 471, ¶30 (quoting Restatement (Second) of Agency § 1(1) (1958)); Hoeft, 70 Wis. 2d at 1034-35. There is no dispute that the Lions Club requested Rhythm Method to act on its behalf to provide music for its 2012 festival and that Rhythm Method consented so to act. Furthermore, the Lions Club had broad contractual control.

¶49 First, the language of the contract gave the Lions Club the right to control each member of Rhythm Method, as they are severally bound to its terms and conditions. Second, it gave the Lions Club the right to control Rhythm Method and its members for everything from showing-up on time, to selecting music and its manner of performance, to disciplining members of Rhythm Method when its leader was instructed by the Lions Club that discipline was requested.

¶50 As the dissent to the court of appeals opinion capably explained:

> According to the record, the band had a contract with the Lions Club to play at the festival; Fryed did not have a separate contract with either the Lions Club or the band. Given these facts, Fryed's presence at the festival was directly related to his role as a member of the band, and the tasks he performed were linked to the band's contract with the Lions Club.

Lang, 384 Wis. 2d 520, ¶35 (Brash, J., dissenting).

25

¶51 Steven Fry laid cords on the floor of the music tent that are alleged to be central to Mrs. Lang's injuries. Fryed Audio, while severally bound by the Lions Club contract, could not actually lay the cords upon which Mrs. Lang focuses. Fryed Audio, an LLC, is a legal person that required an actual person to place the cords for Rhythm Method's sound system. We conclude that Steven Fry was Fryed Audio's agent for that task and therefore, the subagent of the Lions Club for that task as well. Restatement (Third) of Agency § 3.15 cmt. d; see also Brennan v. Healy, 157 Wis. 37, 46, 145 N.W.641 (1914) (reasoning that an instruction that the agent had authority to do what was necessary "to effect the main purpose of the agency, including the employment of a subagent" was a proper instruction).

¶52 Although we can identify no express permission from the Lions Club to create a subagency, as we have explained, "Express authority to appoint subagents is not always necessary, as such authority is usually to be implied when the agency obviously and from its very nature is such as to make the employment of subagents necessary and proper." Halls v. Rhode Island Ins. Co., 193 Wis. 16, 19, 213 N.W.649 (1927) (quoting 2 Corp. Jur. 688). Fryed Audio had authority to create a subagency relationship with Steven Fry because the Lions Club created an agency with a legal person to perform tasks that required a natural person to perform. Id.

¶53 Furthermore, the Lions Club had legal responsibility, stemming from its permit from Milwaukee County, to provide sound in accordance with local ordinance. Neither Rhythm Method nor its members had authority to provide amplified sound independent of

26

its relationship with the Lions Club. As explained above, Rhythm Method's contract with the Lions Club subjected it and its individual members to the Lions Club's control.

¶54 Mrs. Lang's primary assertion is that Fryed Audio provided sound engineering, which she characterizes as a complicated task. She argues the Lions Club lacked expertise to direct such a complicated task, as evidenced by the lack of reasonably precise specifications. Her argument is unpersuasive for at least three reasons.

¶55 First, the task that is alleged to have caused injury was the laying of cords on the floor of the music tent. It was not sound engineering, i.e., determining an electronic mix that was used to produce the requisite sound. While the Lions Club may have lacked sufficient knowledge to direct a sound engineer, it had the ability to require safety measures that attended the laying of cords on the music tent floor from the sound system to the stage. Indeed, the Lions Club owned mats for the purpose of covering cords, and it had the right to control their placement according to Miller's testimony. Furthermore, the Lions Club had the right to control placement of the electronic and electric cords by requiring that they be suspended at the ceiling of the tent, rather than running on the floor. In 2012, the Lions Club required suspension of the cords in the food tent. The Lions Club also possessed orange safety cones that it could have placed. These facts show the Lions Club's right to control and are far removed from the factual underpinnings in Westmas.

27

¶56 In Westmas, we focused on the injury causing conduct, i.e., the methods chosen for removal of the tree branch and for the safety of persons on the ground. Westmas, 379 Wis. 2d 471, ¶40. We also focused on the agreement between Conference Point and Creekside, which described only general concepts. Id., ¶ 39. We concluded that "no facts were presented supportive of the conclusion that Conference Point either controlled or had the right to control the details of Creekside's work." Id., ¶38.

¶57 Second, and relatedly, the absence of reasonably precise specifications cannot weigh significantly against the existence of an agency relationship when the task that is alleged to have caused the injury was the simple task of running cords from the sound equipment to the stage. Geise, 111 Wis. 2d at 416-17. The Lions Club believed that it had done a walk-through after the cords were placed, as had been its habit. It did not direct anyone associated with Rhythm Method to cover the cords, but it had the right to control where the cords were placed and whether they would be covered.

¶58 Third, the Lions Club and Rhythm Method had a prior relationship, wherein Rhythm Method had provided music for other Sweet Applewood Festivals. Rhythm Method had performed the task of laying cords from the sound system to the stage in 2011. Detailed instructions were not needed in 2012, but the right to control where and how the cords were placed did exist, as Miller explained.

### III. CONCLUSION

¶59 We conclude that there are no issues of material fact in regard to the Lions Club's right to control Fryed Audio in regard to laying the cords for Rhythm Method's amplified sound and that Fryed Audio was an agent of the Lions Club who lawfully acted through its subagent, Steven Fry. Because the Lions Club was a statutory owner, Fryed Audio, as its agent, is entitled immunity pursuant to Wis. Stat. § 895.52(2).

¶60 Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶61 REBECCA GRASSL BRADLEY, J. *(concurring).* I agree with the lead opinion that Fryed Audio, LLC was an agent of Lions Club of Cudahy Wisconsin, Inc. and therefore entitled to immunity under Wisconsin's recreational immunity statute, Wis. Stat. § 895.52 (2015-16).[1] I join the mandate reversing the court of appeals decision. I write separately because I disagree with the lead opinion's agency analysis, which derives from Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶¶26-36, 379 Wis. 2d 471, 907 N.W.2d 68. For purposes of recreational immunity, the court concluded in Westmas and the lead opinion concludes in this case that a property owner relinquishes the right to control the activities of third parties it hires to perform services on the property unless the property owner: (1) expressly reserves that right by detailing "reasonably precise specifications" the contractor must follow; and (2) has the expertise the court deems necessary to control the work. Because property owners have the right to control what happens on their own property even in the absence of a contractual reservation of rights or expertise in the subject matter of the contract, I cannot join the lead opinion's reasoning and I respectfully concur.

I

¶62 The parties agree on a number of undisputed facts:

- Lions Club is an "owner" within the meaning of the recreational immunity statute.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

1

- Antoinette Lang was engaged in recreational activity at the time she tripped on the electrical cords.

- Lions Club is immune from liability under the recreational immunity statute.

- Lions Club procured the tents, stages, and other festival activities and decided where and when the bands performed.

- Lions Club was responsible for providing electricity at the festival and it set up the power outlets used by the band for its equipment. A Lions Club member, Francis Miller, testified: "We have electrical service to feed lighting and music in the tents that we're responsible for and make sure that that wiring, the electrical wiring, is safe[.]"

- As it had in the past, Lions Club hired Rhythm Method, LLC to provide music for the festival.

- Fryed Audio is a member of Rhythm Method.

- Steven Fry is the sole member of Fryed Audio and he plugged the band's electrical cords into the outlet provided by Lions Club, running the cord along the ground to the band's equipment.

- Miller testified that a Lions Club official does a walkthrough before the festival begins to make sure there are no trip hazards after the band and vendors have set up their equipment.

- Lang tripped on Rhythm Method's electrical cord laid by Fry.[2]

¶63 Under these undisputed facts, the circuit court granted Lions Club's motion for summary judgment, concluding it was entitled to recreational immunity as an "owner" under Wis. Stat. § 895.52. Subsequently, the circuit court also granted Fryed Audio's motion for summary judgment, applying the recreational immunity statute to Fryed Audio as an agent of Lions Club. Lang appealed the grant of summary judgment to Fryed Audio, and the court of appeals reversed in a 2-1 decision. The majority of the court of appeals applied its understanding of the "reasonably precise specifications" test from Westmas, under which it concluded that Fryed Audio was not an agent of Lions Club because "there is no evidence that Fryed 'was following [the owner's] specific directions' when it placed the cords[.]" Lang v. Lions Club, 2018 WI App 69, ¶4, 384 Wis. 2d 520, 920 N.W.2d 329. Interpreting Westmas' "reasonably precise specifications" test differently, Judge William Brash dissented. Id., ¶¶33-46. Judge Brash determined the "reasonably precise specifications" requirement was "implicit in the [Lions] Club's extensive involvement in the set up of the stage and power sources." Id., ¶43.

---

[2] There is also no dispute that the electrical cord was a condition of the land under Carini v. ProHealth Care, Inc., 2015 WI App 61, ¶¶15-22, 364 Wis. 2d 658, 869 N.W.2d 515 (concluding that alleged negligence relating to the temporary placement of an electrical cord on the ground for a band performance at a picnic was related to maintenance or a condition of the land).

3

¶64 <u>Westmas</u> imported the "reasonably precise specifications" agency test from our governmental immunity jurisprudence, under which it erroneously concluded that the property owner in <u>Westmas</u> had no right to control the tree-trimmer it hired. <u>Westmas</u>, 379 Wis. 2d 471, ¶34. As the <u>Westmas</u> dissent explained, a separate statute governs governmental immunity, and its principles are tailored to "the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions" which "have been collectively interpreted to include any act that involves the exercise of discretion" by the government. <u>Westmas</u>, 379 Wis. 2d 471, ¶66 (Rebecca Grassl Bradley and Kelly, JJ., dissenting) (quoted source omitted). In determining whether governmental immunity extends to the government's agent, the "reasonably precise specifications" test identifies the extent to which the government exercised control over its agent's actions; if the government's contractor followed the government's "reasonably precise specifications" then governmental immunity extends to the contractor. <u>Id.</u>, ¶¶66-67 (Rebecca Grassl Bradley and Kelly, JJ., dissenting). Because the "reasonably precise specifications" test examines the level of <u>governmental</u> discretion exercised by a government contractor, it should not have been used to decide whether the tree-trimmer was an agent of the owner in a recreational immunity case. <u>Id.</u>, ¶¶66-67 (Rebecca Grassl Bradley and Kelly, JJ., dissenting). I would overrule Westmas and apply

4

the agency analysis set forth in the <u>Westmas</u> dissent.  <u>See</u> <u>id.</u>, ¶¶58-77.[3]

II

¶65  Because Wis. Stat. § 895.52 does not define an "agent" entitled to recreational immunity, well-established legal principles governing agency control the analysis.  Applied to the undisputed facts in this case, those principles establish Fryed Audio as an agent of Lions Club.  This conclusion does not depend on whether the allegedly injury-causing task was simple or required expertise Lions Club lacked.  Nor does it hinge on whether Lions Club provided "reasonably precise specifications" to Fryed Audio. An agency relationship exists when one person either controls or has the right to control the activity of another.  <u>Id.</u>, ¶60. Because Lions Club, the "owner," had the right to control Fryed

---

[3] Justice Rebecca F. Dallet's dissent would "respect <u>Westmas</u> as binding precedent."  Justice Dallet dissent, ¶75 n.2.  "While adhering to precedent is an important doctrine for lending stability to the law, not every decision deserves stare decisis effect.  After all, the purpose of stare decisis 'is to make us say that what is false under proper analysis must nonetheless be held to be true, all in the interest of stability.'"  <u>State v. Grandberry</u>, 2018 WI 29, ¶86, 380 Wis. 2d 541, 910 N.W.2d 214 (Rebecca Grassl Bradley, J., dissenting) (quoting Antonin Scalia, <u>A Matter of Interpretation:  Federal Courts and the Law</u> 138-40 (1997)).  Adhering to <u>Westmas</u> perpetuates bad law and will result in arbitrary applications of the recreational immunity statute. "Reflexively cloaking every judicial opinion with the adornment of stare decisis threatens the rule of law, particularly when applied to interpretations wholly unsupported by the statute's text." <u>Manitowoc Co., Inc. v. Lanning</u>, 2018 WI 6, ¶81 n.5, 379 Wis. 2d 189, 906 N.W.2d 130 (Rebecca Grassl Bradley, J., concurring).  "The principle of stare decisis does not compel us to adhere to erroneous precedents or refuse to correct our own mistakes." <u>State v. Outagamie Cty. Bd. of Adjustment</u>, 2001 WI 78, ¶31, 244 Wis. 2d 613, 628 N.W.2d 376.

Audio's placement of the electrical cords, Fryed Audio was an agent of the owner and entitled to recreational immunity under § 895.52.

¶66 The same general agency principles discussed in the Westmas dissent apply equally in this case. See Westmas, 379 Wis. 2d 471, ¶¶61-65 (Rebecca Grassl Bradley and Kelly, JJ., dissenting). Decades ago, this court adopted the definition for agent set forth in the Restatement of Agency. In Meyers v. Matthews, we determined an agent is "a person authorized by another to act on his account and under his control." 270 Wis. 453, 467, 71 N.W.2d 368 (1955) (quoting Restatement (First) of Agency § 1 cmt. d (Am. Law Inst. 1933)). The court applied this definition of agency consistently and frequently in a variety of factual contexts, regardless of whether the right to control was actually exercised by the owner. See, e.g., Schmidt v. Leary, 213 Wis. 587, 590, 252 N.W. 151 (1934) (agency established because "[t]he plaintiff as the owner of the car had the right to control the actions of the driver in driving it on the trip, whether she had occasion to exercise it or not.").

¶67 The court reaches the correct conclusion: Fryed Audio is an agent of Lions Club, entitling it to recreational immunity under Wis. Stat. § 895.52. The record establishes that Lions Club had the right to control the placement of electrical cords running from the power outlet to the band equipment. Lions Club provided the location of the stage as well as the power sources and was in charge of electricity at the festival. The Lions Club member in charge walked through the grounds performing a safety check to identify and rectify potential tripping hazards. Lions Club often

6

covered cords with mats to protect patrons from tripping. Lions Club hired the band, and the language of their contract establishes Lions Club's right to control where electrical cords were placed. Nothing in the contract relinquished this right to control to the band and nothing in the record evidences Lions Club otherwise surrendered it.

¶68 The lead opinion complicates the right-to-control analysis by considering the complexity or simplicity of the allegedly injury-causing task, a new element the lead opinion introduces in order to distinguish this case from Westmas. Whether an owner under the recreational immunity statute has the "right to control" another's act, however, has nothing to do with whether the act is simple or complicated. The lead opinion further distinguishes this case from Westmas by contrasting the experience of Lions Club personnel in laying electrical cords with the unfamiliarity of the owner in Westmas with tree-trimming. Assessing the relative knowledge or expertise of the owner regarding the task the owner hired its agent to perform likewise has no bearing on whether the owner retained the right to control the agent's execution of the work.

¶69 The owner in Westmas did not need expertise in tree-trimming in order to control the tree-trimmer it hired to work on its property; "[i]f Conference Point had endeavored to tell Creekside how to trim trees, it is certainly possible, and maybe even likely, that its lack of expertise would cause it to exercise that control unwisely, or ineffectually. But lack of competency does not negate the right to control, it just makes it imprudent."

7

*Westmas*, 379 Wis. 2d 471, ¶73 (Rebecca Grassl Bradley and Kelly, JJ., dissenting). Similarly, the lead opinion attempts to distinguish this case from *Westmas* by contrasting the simplicity of laying electrical cords with the complexity of trimming trees. As explained by the dissent in *Westmas*, "the danger presented in this case has nothing to do with expertise in tree-trimming. It is the danger of a heavy object falling on someone walking by. . . . This danger, and the means of avoiding it, are known to quite literally everyone: Do not be where the branch falls." *Id.* Preventing injury from falling branches is no more complicated than preventing injury from electrical cords; regardless, the degree of difficulty associated with each task has nothing to say about a property owner's right to control their execution.

III

¶70 The new agency analysis the court adopted in *Westmas* forced the lead opinion to attempt to distinguish *Westmas* from this case. Instead, the court should abandon *Westmas*' misapplication of the governmental immunity test and return to a traditional agency analysis in recreational immunity cases. Under well-established agency principles, Lions Club had the right to control where Fryed Audio placed the electrical cord; therefore, Fryed Audio was an agent of Lions Club and entitled to recreational immunity.

¶71 The court correctly reverses the court of appeals and holds that Fryed Audio was an agent of the Lions Club because the undisputed facts demonstrate Lions Club had the right to control the placement of the electrical cord on which Lang tripped.

8

Importing the "reasonably precise specifications" test from governmental immunity cases muddied the right-to-control test in recreational immunity cases. In attempting to distinguish Westmas from this case, the lead opinion further complicates the analysis by adding yet another ill-fitting consideration of the simplicity or complexity of the allegedly injury-causing task. None of this is necessary because well-established agency principles already answer the question of whether an owner has the right to control its agent, thereby entitling the agent to recreational immunity.

¶72 I join the mandate reversing the court of appeals because I agree that Fryed Audio was an agent of Lions Club based on Lions Club's right to control how Fryed Audio laid the electrical cord. The circuit court correctly granted summary judgment to Fryed Audio, which is immune from liability to Lang under Wis. Stat. § 895.52. I cannot join the lead opinion's reasoning because it relies on the erroneous agency analysis of Westmas, while adding additional considerations irrelevant to the determination of whether an owner ceded the right to control its agent. The lead opinion erodes private property rights by determining that an owner loses its right to control the actions of a third party hired to perform services on the property unless the owner dictates the details of the work's execution and possesses the expertise to do so. I respectfully concur.

¶73 I am authorized to state that Justice DANIEL KELLY joins this concurrence.

9

¶74 REBECCA FRANK DALLET, J. *(dissenting).* Before this court is a straightforward question: is Fryed Audio, LLC an "agent" of the Lions Club of Cudahy Wisconsin, Inc., so as to be entitled to recreational immunity under Wis. Stat. § 895.52? Fryed Audio consists of one member, Steven Fry, who is also a member of the band Rhythm Method, LLC. Rhythm Method contracted to play at a festival hosted by the Lions Club and tasked Fryed Audio with setting up its sound equipment. Fryed Audio never entered into a separate contract with the Lions Club. Antoinette Lang allegedly tripped on an electric cord laid by Fryed Audio, which led to this lawsuit.[1]

¶75 The lead opinion concludes that Fryed Audio is an agent of the Lions Club because the Lions Club had the "right to control Fryed Audio in regard to laying the cords for Rhythm Method's amplified sound and that Fryed Audio was an agent of the Lions Club who lawfully acted through its subagent, Steven Fry." Lead op., ¶3. Neither the lead opinion nor the concurrence provide a coherent stopping point for recreational immunity, and both go beyond the bounds of even a liberal statutory interpretation. Applying the plain statutory language and our controlling precedent, Westmas v. Creekside Tree Service, Inc., 2018 WI 12, 379 Wis. 2d 471, 907 N.W.2d 68, I conclude that Fryed Audio is not

---

[1] As the lead opinion correctly notes, Lang sued several parties and Fryed Audio is the only remaining defendant. Lead op., ¶12.

1

entitled to recreational immunity under Wis. Stat. § 895.52.[2] Accordingly, I respectfully dissent.

¶76 The legislature enacted the recreational immunity statute, Wis. Stat. § 895.52, in light of "the continual shrinkage of the public's access to recreational land in the ever more populated modern world." Hall v. Turtle Lake Lions Club, 146 Wis. 2d 486, 489, 431 N.W.2d 696 (Ct. App. 1988). The stated purpose of § 895.52 is to limit the liability of property owners, and their officers, employees, and agents, to encourage them to open their lands to the public for recreational activities. See Roberts v. T.H.E. Ins. Co., 2016 WI 20, ¶28, 367 Wis. 2d 386, 879 N.W.2d 492. Although the legislature has indicated that the recreational immunity statute should be construed liberally in favor of property owners, see 1983 Wis. Act 418, § 1, this does not mean that it affords limitless immunity. As this court has explained:

> The benefits of granting immunity, i.e., encouraging landowners to open their lands to the public, comes from immunizing people or municipalities in their capacities as landowners . . . . Extending immunity to landowners for negligently performing in a capacity unrelated to the land . . . will not contribute to a landowner's decision to open the land for public use.

Roberts, 367 Wis. 2d 386, ¶36 (quoting Linville v. City of Janesville, 184 Wis. 2d 705, 719, 516 N.W.2d 427 (1994)).

---

[2] The concurrence "would overrule Westmas and apply the agency analysis set forth in the Westmas dissent." Concurrence, ¶64. I respect Westmas as binding precedent and apply the test enunciated by a majority of the court in that case just two years ago. Westmas v. Creekside Tree Service, Inc., 2018 WI 12, 379 Wis. 2d 471, 907 N.W.2d 68.

¶77 This case involves a question of statutory interpretation regarding a single word in Wis. Stat. § 895.52: "agent." We recently interpreted the term "agent" in the recreational immunity context in Westmas, 379 Wis. 2d 471. In Westmas, the plaintiff was walking on a public path on property owned by Conference Point when she was struck and killed by a tree branch trimmed by Creekside Tree Service. Id., ¶13. Conference Point had contracted with Creekside for pruning and removal of trees overhanging the path. Id., ¶8. Creekside sought immunity under the recreational immunity statute as an "agent" of Conference Point, the statutory "owner." Id., ¶25. After examining agency law in other contexts, most notably the governmental immunity statute, the Westmas court concluded: "an agent is one who acts on behalf of and is subject to reasonably precise control by the principal for the tasks the person performs within the scope of the agency. Whether an independent contractor is an agent is a fact-specific inquiry." Id., ¶36 (emphasis added). Applying this test to the undisputed facts, the Westmas court determined that "Creekside was not an agent of Conference Point because Conference Point had neither control of, nor the right to control, the details of Creekside's work, including the acts that caused injury to [the plaintiff]." Id., ¶3.

¶78 The lead opinion here purports to apply Westmas, but its analysis misses the mark. In distinguishing Westmas, the lead opinion asserts that the placement of cords is a "simple task" for which no reasonably precise specifications need be given and that "both the written contract and the testimony of [Frank] Miller

3

showed that the Lions Club had a right to control how the cords were placed and whether mats were used to cover them." Lead op., ¶36. The concurrence would overturn Westmas, but similarly finds, in conclusory fashion, that the "language of [the] contract establishes Lions Club's right to control . . . ." Concurrence, ¶67.

¶79 Neither the contract nor Miller's testimony, however, support the conclusion of the lead opinion or the concurrence. The contract does not say that the Lions Club had "the right to" control the sound setup. Instead, it says the exact opposite: "Sounds and lights by band." Miller's deposition further confirms this understanding: "The sound companies who were providing services to the bands weren't contracted by us, so we did not get involved in how they set up their equipment." This evidence demonstrates the contract left the "means and methods" for setting up the band's sound to the band. This is no different from Westmas, where the landowner left the "means and methods" of tree-trimming to the tree trimmer as demonstrated by the lack of "reasonably precise" specifications for how the work was to be performed. See Westmas, 379 Wis. 2d 471, ¶¶36, 40.

¶80 The lead opinion attempts to circumvent Westmas's requirement of reasonably precise specifications by contending that laying cords is a "simple task" for which no reasonably

4

precise specifications are necessary.[3] See lead op., ¶¶36, 57. Such a rule is really no rule at all. Its amorphous nature gives no clarity to courts and litigants moving forward and will inevitably generate more litigation. By contrast, the rule set forth in Westmas is clear: whether the principal provided reasonably precise specifications for the task. In this case, the rule set forth in Westmas dictates a result contrary to that reached by a majority of this court because no specifications were given for Fryed Audio's work, much less reasonably precise ones.

¶81 Simply saying that the Lions Club retained the right to control everything at the festival, whether it exercised that control or not, results in the extension of broad immunity not contemplated by the recreational immunity statute. The lead opinion and the concurrence, by phrasing their conclusions in this expansive way, nullify the "fact-specific" and "fact-bound" inquiry required by Westmas.

¶82 In addition to nullifying Westmas's fact-specific inquiry, a majority of this court extends immunity outside of the confines of Wis. Stat. § 895.52. The lead opinion creates immunity not only for an owner and its officers, employees, and agents, as provided by the statute, but also for "subagents," a formulation

---

[3] The lead opinion initially claims that "[i]t does not matter whether the conduct that caused the injury is complex or simple," lead op., ¶30, but quickly reverses course by holding that "whether the injury-causing task is simple or requires some degree of specific knowledge . . . affects the weight we give to the absence or presence of 'reasonably precise specifications,'" lead op., ¶35. The lead opinion's undoing of Westmas's reasonably precise specifications requirement relies entirely on its amorphous simple-complex distinction.

not briefed or argued by any party. That is, not an agent of an owner, but an agent of an agent of an owner. Under both the lead opinion's formulation of "subagency" and the concurrence's definition of "right to control," nearly every person associated with the festival would be entitled to immunity. The Lions Club has the broad "right to control" what goes on at its festival, so everyone from the president of the Lions Club to a delivery driver supplying cotton candy supplies to a food truck would likely enjoy recreational immunity under the new standards offered by a majority of this court.[4]

¶83 Further, the lead opinion's discussion of subagency is premised on secondary sources and foreign cases. The precious little support for the lead opinion's discussion on Wisconsin law comes from century-old cases that do not perform any in-depth exploration of the topic. See lead op., ¶40 n.5 (citing Estes v. Crosby, 171 Wis. 73, 79, 175 N.W. 933 (1920)); id., ¶42 (citing McKinnon v. Vollmar, 75 Wis. 82, 89, 43 N.W. 800 (1889)). But the authority that the lead opinion cites makes one thing clear: agency and subagency are two separate and distinct legal concepts. And to the extent the law recognizes this distinct category of subagent, it is not included in the discrete list of "officer, employee or agent of an owner" provided in Wis. Stat. § 895.52(2)(b). We must presume that the legislature "'carefully and precisely' chooses statutory language to express a desired meaning." Indus. to Indus., Inc. v. Hillsman Modular Molding,

---

[4] After all, the Lions Club could control what route the delivery driver takes when driving on the property.

6

Inc., 2002 WI 51, ¶19 n.5, 252 Wis. 2d 544, 644 N.W.2d 236 (quoted source omitted). Implementing this principle, we must conclude that the legislature knew what it was doing when it included "agents" but not "subagents" within its grant of recreational immunity in § 895.52(2)(b).

¶84 Essentially, the majority of this court is telling members of the public that when they enter any community festival, they do so at their own risk. This result is far afield from the immunity necessitated to achieve the stated purpose of the recreational immunity statute——to encourage property owners to open their lands to the public to engage in recreational activities. Fryed Audio played no part in opening the land and its liability here would not deter the Lions Club from hosting its festival again, yet the majority of this court extends to it immunity. This conclusion is contrary to the plain language of Wis. Stat. § 895.52(2)(b) and a faithful application of our precedent to the record in this case.

¶85 For the foregoing reasons, I respectfully dissent.

¶86 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

¶87 BRIAN HAGEDORN, J. *(dissenting).* An agency relationship is not the same as a contract for services. The outcome in this case takes us further from that principle. The key question in agency law is whether the principal has the right to control the agent's activities——that is, the means and manner of the agent's work. Underlying this case, however, is an injury arising from a particular type of activity: negligent physical conduct. Our law has long distinguished between the physical conduct of the two types of agents——independent contractors and servants. An independent contractor is one whose physical conduct is not subject to the control of another, while a servant's physical conduct is.

¶88 Wisconsin's recreational immunity statute includes within its grant of immunity "agents" of an owner. Wis. Stat. § 895.52(2) (2017-18).[1] This of course doesn't apply to "agents" not acting within the scope of their agency. That is, for immunity to be granted to an agent, the physical conduct that caused the injury must be within the scope of any agency relationship. By definition, the physical conduct of independent contractors is not within the scope of any independent contractor agency relationship. This means the only kind of agency relationship that includes within its scope negligent physical conduct that causes injury is a master-servant relationship, where the physical conduct of the servant is always under the control of and attributable to the master. See Restatement (Second) of Agency

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

§ 250 (1958) (stating the general rule that a "principal is not liable for physical harm caused by the negligent physical conduct of a non-servant agent").

¶89 Thus, the question of whether Fryed Audio, LLC was acting as an agent of the Lions Club of Cudahy Wisconsin, Inc. when carrying out the injury-causing conduct is premised on whether the Lions Club and Fryed Audio were in a master-servant relationship. Under our law, no such relationship was present here. Fryed Audio was therefore not acting within the scope of any agency relationship when laying the cords and is not entitled to immunity under Wis. Stat. § 895.52(2). I respectfully dissent.

I

¶90 We have adopted and applied the definition of agency from the Restatement (Second) of Agency: "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1); see, e.g., Strupp v. Farmers Mut. Auto. Ins. Co., 14 Wis. 2d 158, 167, 109 N.W.2d 660 (1961). "It is well established that the most important factor in determining whether a person is an agent is the extent of the control retained over the details of the work." Kablitz v. Hoeft, 25 Wis. 2d 518, 521, 131 N.W.2d 346 (1964).

¶91 Our law has distinguished between two types of agents. Agents may be either servants or independent contractors.

2

¶92 All servants are agents, but agents of a particular kind. Saunders v. DEC Int'l, Inc., 85 Wis. 2d 70, 77 & n.1, 270 N.W.2d 176 (1978). "A servant is one employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." Heims v. Hanke, 5 Wis. 2d 465, 468, 93 N.W.2d 455 (1958), overruled in part by Butzow v. Wausau Mem'l Hosp., 51 Wis. 2d 281, 187 N.W.2d 349 (1971). The typical example is the employee-employer relationship. Romero v. W. Bend Mut. Ins. Co., 2016 WI App 59, ¶39, 371 Wis. 2d 478, 885 N.W.2d 591. When employees are acting within the scope of their employment, they are acting as agents of the employer. Kerl v. Dennis Rasmussen, Inc., 2004 WI 86, ¶23, 273 Wis. 2d 106, 682 N.W.2d 328; Restatement (Second) of Agency § 219. Masters have the right to control, and are therefore liable for, the physical conduct of their servants. This is true whether masters exercise that control, whether it is spelled out in a contract, or whether reasonably precise specifications have been prescribed. The nature of the right to control the physical conduct necessary to establish a master-servant relationship has a broader body of law to guide us. That will be discussed below.

¶93 Independent contractors, in contrast, may or may not be agents. Saunders, 85 Wis. 2d at 77 & n.1; Restatement (Second) of Agency § 2(3). Sometimes independent contractors are simply hired to perform a service. The contract may contain reasonably precise specifications or other performance and quality-oriented details. It also may not. But none of that is key to whether the independent

3

contractor is acting as an agent with respect to the independent contractor's physical activities.

¶94 While an independent contractor may enter into a contractual relationship to do something for another, the independent contractor "is not controlled by the other nor subject to the other's right to control with respect to his physical conduct." Romero, 371 Wis. 2d 478, ¶40 (quoting Restatement (Second) of Agency § 2(3)). In other words, one who engages an independent contractor, whether an agent or not, does not have the right to control the physical conduct of the independent contractor. Even a contract that requires certain outcomes or appears to retain control over certain areas does not, with respect to the physical conduct of the independent contractor, constitute the right to control necessary to establish a fiduciary agency relationship. Hence, even an independent contractor agent is, with respect to his physical conduct, not acting within the scope of the agency relationship.

¶95 By way of example, if I pay a lawn company to mow my lawn, I could demand control over certain things or require specific results——cut once per week and no higher than 1.5 inches, and remove sticks ahead of time. Suppose the lawn company missed a stick, and it was flung into a passerby, causing injury. Now I certainly could have gone out and told the company, "You missed a stick over there; go pick it up." In that respect, one might describe that as a right to control. But with respect to the negligent physical conduct causing the injury, the lawn company is not acting as my agent. I do not have the type of relationship

where the lawn company is acting as a fiduciary on my behalf, and with my consent. This is merely an independent contractor hired to perform a contract for services. See generally Restatement (Second) of Agency § 14N (describing non-agent and agent independent contractors). A results-oriented contract, whether detailed or not, does not mean the lawn company is acting as my agent in carrying out these physical activities.

¶96 An inverse example comes by way of our 1983 decision in Giese, where we concluded that a son cutting the lawn at the direction of his father was an agent. Giese v. Montgomery Ward, Inc., 111 Wis. 2d 392, 416-17, 331 N.W.2d 585 (1983). But there, we explained that in order for the father to be liable for the physical harm to third persons caused by the tortious conduct of his son, "the master-servant relationship must exist." Id. at 415. This is because physical harm to third persons caused by the physical conduct of independent contractors is, by definition, not attributable to the principal. The kind of agency that would ascribe liability to the father must instead be rooted in a master-servant relationship. And we ultimately concluded the son was acting as his father's servant——that was the basis for liability. Id. at 416.

¶97 Another example helps illustrate the distinction. If I hire an attorney from a law firm to represent me in a case, I have hired an independent contractor. For purposes of the attorney's representation, the attorney acts as my agent——having the authority to act on my behalf with my consent, and subject to my control. However, I have no control over the attorney's physical

conduct. Therefore, an attorney who negligently injures another while driving to represent me in a deposition is not acting on my behalf. I am not liable for that conduct. See Restatement (Second) of Agency § 220 cmt. e ("The salesman of a real estate broker, while driving T, a prospective customer, to view a house, negligently injures him. The broker, but not the broker's principal, is subject to liability to T."); Restatement (Second) of Agency § 250 cmts. a & b ("[T]he principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such."; "There is no inference that because a principal has authorized an act to be done which would be non-tortious if done carefully, he is liable for the act of a non-servant if the latter was negligent in his performance.").

¶98 A 1978 decision of this court shows why the difference between independent contractors and servants is key to this case. In Arsand v. City of Franklin, the surviving spouse and estate representative of Mr. Arsand sued the City after an airplane accident caused his death. 83 Wis. 2d 40, 42-43, 264 N.W.2d 579 (1978). They argued the pilot, whose negligence the parties stipulated to, was acting as the City's agent. Id. at 43. The jury instructions framed the question accordingly, and the jury agreed the pilot was an agent. Id. at 43-45. We reversed, however. The question, we said, is not whether an agency relationship exists. Id. at 49. Because this was an injury arising from the physical conduct of the pilot, the determination of an agency relationship was insufficient to answer the question. Id. Since agency encompasses independent contractor agents, and

6

principals are not responsible for the physical conduct of independent contractors, the jury instruction did not sufficiently establish liability. Id. at 49-50. The real question, and what the jury should have been asked, is whether the pilot was a servant of the City. Id. at 50. Therefore, we reversed and remanded. Id. at 57.

¶99 With this distinction in mind, we examine the relationship between Lions Club and Fryed Audio.

II

¶100 Because this case involves an injury to a third party due to the negligent physical conduct of Fryed Audio, the key question is whether Fryed Audio was a servant of the Lions Club. If Fryed Audio was an independent contractor of the Lions Club (or something less), then by definition its physical conduct was not within the scope of any agency relationship, regardless of any contractual control or specifications. On the other hand, if Fryed Audio was a servant of the Lions Club, it was acting as an agent with respect to its physical conduct——the conduct that caused the injury.

¶101 While, "[t]he right to control is the dominant test in determining whether an individual is a servant," we have affirmed that other factors inform the analysis. Pamperin v. Trinity Mem'l Hosp., 144 Wis. 2d 188, 199, 423 N.W.2d 848 (1988). These include: "the place of work, the time of the employment, the method of payment, the nature of the business or occupation, which party furnishes the instrumentalities or tools, the intent of the parties

7

to the contract, and the right of summary discharge of employees."
Id.

¶102 The Restatement (Second) of Agency, which we have cited and approved with regularity in this area, similarly provides this framework:

In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2).

¶103 As these factors reflect, though an employment relationship is not the only type of master-servant relationship that can be created, it is paradigmatic. The Restatement (Second)

8

of Agency notes that most statutes used the word "employee" in lieu of "servant," and that in general, the term "is synonymous with servant." Id. at cmt. g. The Restatement (Third) of Agency goes even further. It eliminates the use of "master" and "servant," replacing it with a determination of whether the actor is an "employee" acting within the scope of his or her employment. Restatement (Third) of Agency § 2.04 & cmt. a (2006).

¶104 The relationship between Fryed Audio and the Lions Club looks nothing like a master-servant relationship. At the outset, there is no formal relationship between Fryed Audio and the Lions Club at all. There is no contractual relationship between these two entities establishing the Lions Club's authority to determine how Fryed Audio carried out the means and manner of its sound system set-up responsibilities. As one court helpfully explained:

> The most common language used to flesh out the right of control, however, typically references the principal's power to determine the "means and details" of the agent's work. Thus, the right of control "includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task."

Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr., 643 F. Supp. 2d 883, 888 (S.D. Tex. 2008) (quoted source omitted). No contractual language of this kind exists here. Nothing else in the record suggests the Lions Club had the right to control the means and manner of how Fryed Audio set up the sound system. Id. ("A right of control requires more than a general right to order the work stopped or resumed, to inspect its progress or receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations. . . . There

9

must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.").

¶105 None of the other related indicia of a master-servant relationship are found here either. The Lions Club does not purport to have told Fryed Audio when to do its job. Setting up band sound systems was not a normal part of the Lions Club operations, nor did it furnish equipment or training or expertise for such a task. This was a one-time job orchestrated by a different entity——Rhythm Method, LLC. Moreover, the Lions Club didn't even have an obligation to pay Fryed Audio. Pamperin, 144 Wis. 2d at 201-02 ("[F]actors which indicate a master-servant relationship, e.g., a fixed monthly salary and withholding of taxes and social security, are not present in this case."). The Lions Club had no contractual right to fire Fryed Audio. There was no agreement for fees, no sharing of offices or billing, no shared or mandated insurance, and no oversight by the Lions Club in determining who Fryed Audio could serve. See id. at 201 (examining factors including maintaining separate offices, billing and collection responsibility, authority to establish fees, responsibility for malpractice insurance, and permission to work for others).

¶106 While some limited kinds of control may have been present here by virtue of Fryed Audio doing work at an event Lions Club was organizing, this comes nowhere close to a master-servant relationship. Because that is the only kind of relationship where agency would extend to control of Fryed Audio's physical conduct by the Lions Club——the kind of conduct that caused the injury——

10

Fryed Audio was not acting as the agent of the Lions Club by laying down the cords.

## III

¶107 The key question in agency is the right to control. But this means more than a contractual agreement for services establishing some types of control. It means the right to control the means and manner of accomplishing the work performed or at issue. Only masters have the requisite right to control the physical conduct of their servants. Independent contractors are not, with respect to their physical conduct, acting within the scope of any agency relationship that might exist. Because Fryed Audio was not in a master-servant relationship with the Lions Club, its negligent physical conduct cannot be said to be within any agency relationship. Therefore, Fryed Audio is not entitled to immunity under the recreational immunity statute.

11